(No. 32094.—

THE PEOPLE, *ex rel.* Alda Wallace *et al.,* Defendants in Error, *vs.* DARRELL LABRENZ *et al.,* Plaintiffs in Error.

*Opinion filed March 20, 1952.*

KARL M. MILGROM, of Chicago, and HAYDEN C. COVINGTON, of Brooklyn, N. Y., for plaintiffs in error.

IVAN A. ELLIOTT, Attorney General, of Springfield, and JOHN S. BOYLE, State's Attorney, of Chicago, (EDWIN T. BREEN, JOHN T. GALLAGHER, RUDOLPH L. JANEGA, ARTHUR F. MANNING, and WILLIAM J. McGAH, JR., all of Chicago, of counsel,) for defendants in error.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

After a hearing upon a petition filed in the circuit court of Cook County, an order was entered finding that Cheryl Linn Labrenz, an infant then eight days old, was a depend-

ent child whose life was endangered by the refusal of her parents to consent to a necessary blood transfusion. The court appointed a guardian for the child and authorized the guardian to consent to a blood transfusion. The propriety of that action is challenged here upon a writ of error raising constitutional issues.

The petition was filed on April 17, 1951. It alleged that Cheryl Linn Labrenz was born on April 11, 1951, that she was then in a hospital in Chicago, and that her parents, Darrell and Rhoda Labrenz, were wholly unwilling to care for and protect her, so that she had become a dependent child. The petition prayed that the child be taken from its parents and placed under the guardianship of a suitable person to be appointed by the court.

At the hearing which was had on this petition on April 18, 1951, the evidence showed that the child suffered from erythrobastosis fetalis (commonly called the RH blood condition,) a disease in which the red blood cells are destroyed by antibodies, or poisons. Hospital records and medical testimony established that the child's blood count had been dropping steadily since her birth; that the normal blood count of a child of her age was about 5,000,000, whereas her blood count was 1,950,000; that antibodies in the baby's blood stream were gradually destroying all of the red blood cells; that her blood-supplying system was unable to furnish a supply of its own blood adequate to overcome the condition, and that a blood transfusion was necessary.

Three doctors testified. Two were certain that the child would die unless a transfusion was administered. The third doctor testified that the child had a slim chance to live without a transfusion, but that even if she did live, without a transfusion her brain would probably be so injured that she would be mentally impaired for life. The medical testimony also dealt with the degree of risk involved in a blood transfusion. One doctor testified that there would be no more hazard in a transfusion than in taking an aspirin.

While all three doctors testified that there would be risks involved if diseased or mistyped blood was used in the transfusion, all of them agreed that such risk as existed was due to the impossibility of eliminating completely the chance of human error, and that, properly conducted, a transfusion would not involve any serious hazard.

The parents of the child testified that their refusal to consent to a transfusion was based upon religious grounds. Darrell Labrenz, the child's father, testified: "it is my belief that the commandment given us in Genesis, Chapter 9, Verse 4, and subsequent commandment of Leviticus, Chapter 17, Verse 14, and also in the testimony after Christ's time and recorded in Acts, 15th Chapter, it is my opinion that any use of the blood is prohibited whether it be for food or whether it be for, as modern medical science puts it, for injections into the blood stream and as such I object to it. The life is in the blood and the life belongs to our father, Jehovah, and it is only his to give or take; it isn't ours, and as such I object to the using of the blood in connection with this case."

Rhoda Labrenz, the mother, testified that "we believe it would be breaking God's commandment to take away blood which he told us to eat of the flesh but should not take of the blood into our systems. The life is in the blood and blood should not be drained out. We feel that we would be breaking God's commandment, also destroying the baby's life for the future, not only this life, in case the baby should die and breaks the commandment, not only destroys our chances but also the baby's chances for future life. We feel it is more important than this life."

At the conclusion of the evidence offered on behalf of the State, and again at the conclusion of all the evidence, a motion to dismiss the petition was overruled. The court appointed its chief probation officer to be guardian of the person of Cheryl Linn Labrenz, directed him to consent to a blood transfusion, and retained jurisdiction for the

purpose of making further orders for the welfare of the child. On May 4, 1951, the guardian reported to the court that a transfusion had been administered on April 18, 1951, and that the child's health had greatly improved. The court then ordered that the child be released from the hospital and returned to the custody of her parents but refused to discharge the guardian because it found that further periodic medical examinations would be necessary to determine the need for additional transfusions. On June 15, 1951, the court discharged the guardian, released the child to her parents, and ordered that the proceeding be dismissed.

Before we reach the merits, we meet the State's contention that the case is now moot and should be dismissed because the blood transfusion has been administered, the guardian discharged, and the proceeding dismissed. Because the function of courts is to decide controverted issues in adversary proceedings, moot cases which do not present live issues are not ordinarily entertained. "The general rule is that when a reviewing court has notice of facts which show that only moot questions or mere abstract propositions are involved or where the substantial questions involved in the trial court no longer exist, it will dismiss the appeal or writ of error." *People v. Redlich,* 402 Ill. 270, 279.

But when the issue presented is of substantial public interest, a well-recognized exception exists to the general rule that a case which has become moot will be dismissed upon appeal. (See cases collected in 132 A.L.R. 1185.) Among the criteria considered in determining the existence of the requisite degree of public interest are the public or private nature of the question presented, the desirability of an authoritative determination for the future guidance of public officers, and the likelihood of future recurrence of the question.

Applying these criteria, we find that the present case falls within that highly sensitive area in which governmental action comes into contact with the religious beliefs of individual citizens. Both the construction of the statute under which the trial court acted and its validity are challenged. In situations like this one, public authorities must act promptly if their action is to be effective, and although the precise limits of authorized conduct cannot be fixed in advance, no greater uncertainty should exist than the nature of the problems makes inevitable. In addition, the very urgency which presses for prompt action by public officials makes it probable that any similar case arising in the future will likewise become moot by ordinary standards before it can be determined by this court. For these reasons the case should not be dismissed as moot.

As an additional reason for retaining the case for decision, plaintiffs in error suggest that the determination below, even though standing unreviewed, would nevertheless bar a subsequent action to recover damages for a violation of the rights of the parents or of the child. So far as we have been able to ascertain, the effect, as *res judicata*, of a judgment which could not be reviewed because intervening circumstances made the case moot, has not been settled in this State. Such authority as exists elsewhere is not in agreement. (See Am. Law Inst. Restatement, Judgments, sec. 69(2); cf: *United States* v. *Munsingwear, Inc.* 340 U.S. 36; see cases collected in 157 A.L.R. 1038.) Because we hold that the public interest requires that the case be retained for decision, we do not decide this issue.

Turning now to the merits of the case, plaintiffs in error first argue that the court below lacked jurisdiction because the child was not a "neglected" or "dependent" child within the meaning of the statute. The jurisdiction which was exercised in this case stems from the responsibility of government, in its character as *parens patriae,* to

care for infants within its jurisdiction and to protect them from neglect, abuse and fraud. (*Witter* v. *Cook County Comrs.* 256 Ill. 616, 622.) Historically exercised by courts of chancery, (*In re Petition of Ferrier,* 103 Ill. 367,) it is "of ancient origin." (*Cowles* v. *Cowles,* 3 Gilman, 435.) That ancient equitable jurisdiction was codified in our Juvenile Court Act, which expressly authorizes the court, if circumstances warrant, to remove the child from the custody of its parents and award its custody to an appointed guardian. Ill. Rev. Stat. 1949, chap. 23, pars. 190-220.

So far as here pertinent, the statute defines a dependent or neglected child as one which "has not proper parental care." (Ill. Rev. Stat. 1949, chap. 23, par. 190). The record contains no suggestion of any improper conduct on the part of the parents except in their refusal to consent to a blood transfusion. And it is argued that this refusal on the part of the parents does not show neglect, or a lack of parental care. Neglect, however, is the failure to exercise the care that the circumstances justly demand. It embraces wilful as well as unintentional disregard of duty. It is not a term of fixed and measured meaning. It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes. The question here is whether a child whose parents refuse to permit a blood transfusion, when lack of a transfusion means that the child will almost certainly die or at best will be mentally impaired for life, is a neglected child. In answering that question it is of no consequence that the parents have not failed in their duty in other respects. We entertain no doubt that this child, whose parents were deliberately depriving it of life or subjecting it to permanent mental impairment, was a neglected child within the meaning of the statute. The circuit court did not lack jurisdiction.

Plaintiffs in error argue that they merely exercised their right to avoid the risk of a proposed hazardous opera-

tion—the transfusion—and that such a choice does not indicate a lack of proper parental care. The short answer is that the facts here disclose no such perilous undertaking, but, on the contrary, an urgently needed transfusion—virtually certain of success if given in time—with only such attendant risk as is inescapable in all of the affairs of life. The argument, based upon such cases as *In re Hudson,* 13 Wash. 2d 673, 126 Pac. 2d 765, and *In re Tuttendario,* 21 Pa. Dist. R. 561, which deal with operations involving substantial risk of life, is obviously not in point.

It is next contended that if the Juvenile Court Act is held to be applicable, it deprives the parents of freedom of religion, and of their rights as parents, in violation of the fourteenth amendment to the constitution of the United States and of section 3 of article II of the constitution of Illinois. This contention is based upon the parents' objection to the transfusion because of their belief that blood transfusions are forbidden by the Scriptures. Because the governing principles are well settled, this argument requires no extensive discussion. Concededly, freedom of religion and the right of parents to the care and training of their children are to be accorded the highest possible respect in our basic scheme. (*West Virginia State Board of Education* v. *Barnette,* 319 U.S. 624; *Meyer* v. *Nebraska,* 262 U.S. 390; *Pierce* v. *Society of Sisters,* 268 U.S. 510.) But "neither rights of religion or rights of parenthood are beyond limitation." *Prince* v. *Massachusetts,* 321 U.S. 158, 167; see: *Reynolds* v. *United States,* 98 U.S. 145; *Jacobson* v. *Massachusetts,* 197 U.S. 11.

Indeed, the early decision in the *Reynolds case,* upholding a Mormon's conviction for bigamy against the defense of interference with religious freedom as guaranteed in the first amendment, leaves no doubt about the validity of the action here taken. The following language of that opinion is of particular interest: (98 U.S. at p. 166.)

"Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices. Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice? Or if a wife religiously believed it was her duty to burn herself upon the funeral pile of her dead husband, would it be beyond the power of the civil government to prevent her carrying her belief into practice?"

The recent *Prince* decision reinforces that conclusion. The court there held that a State, acting to safeguard the general interest in the well-being of its youth, could prohibit a Jehovah's Witness child from distributing religious pamphlets on the street even though the child was accompanied by her adult guardian. Obviously, the facts before us present a far stronger case for State intervention. Further, the court observed in reaching its conclusion in the *Prince case:* (321 U.S. at 166, 170.) "The right to practice religion freely does not include liberty to expose the community or child to communicable disease or the latter to ill health or death. * * * Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when, they can make that choice for themselves."

We hold, therefore, that neither the statute nor the action of the court pursuant to the statute violated the constitutional rights of plaintiffs in error.

The final contention is that the trial court committed prejudicial error in excluding from evidence the religious magazine, *Awake.* The contention is without merit. Except as it might bear upon the good faith of the parents' belief in the Scriptural prohibition against blood transfusion, it

was inadmissible as hearsay. And since the sincerity of the parents' religious beliefs was not questioned, the exclusion of the magazine was not error.

The judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*