*In re* IRIS GOMEZ *et al.*, Minors.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* LYDIA GOMEZ *et al.*, Respondents-Appellants.)

First District (3rd Division)   No. 76-850

Opinion filed October 5, 1977.

James J. Doherty, Public Defender, of Chicago (Frances Sowa and Marc Fogelberg, Assistant Public Defenders, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Michael E. Shabat, and Linda Dale Woloshin, Assistant State's Attorneys, of counsel), for the People.

Miss JUSTICE McGILLICUDDY delivered the opinion of the court:

In an adjudicatory hearing held on June 19, 1975, on petitions for adjudication of wardship, the Circuit Court of Cook County, Juvenile Division, entered a finding of neglect for each of the minor children involved in this proceeding, Iris Gomez, Angel Gomez and Ricky Gomez, and adjudged each of the three minor children to be wards of the court. At the dispositional hearing on September 12, 1975, they were placed under the guardianship of Richard S. Laymon, Guardianship Administrator of the Illinois Department of Children and Family Services. The parents of these children, Lydia and Modesto Gomez, appeal those decisions, raising two issues for review: whether certain evidence concerning prior drug abuse by the children's mother was properly admitted, and whether the State proved by a preponderance of the evidence that the home environment was injurious to the Gomez children.

On March 21, 1975, the Department of Children and Family Services filed a petition for adjudication of wardship on behalf of Iris Gomez, alleging that her home environment was injurious to her welfare, in contravention of section 2—4(1)(b) of the Juvenile Court Act. (Ill. Rev.

Stat. 1975, ch. 37, par. 702—4(1)(b).) Similar petitions were filed on behalf of Iris' brothers, Angel and Ricky, on May 27, 1975. At the time these petitions were filed Iris was almost 9, Angel was almost 10 and Ricky was 16.

At the adjudicatory hearing the State's first witnesses were Susan Klempner and Joseph Motolenich, teachers in the bilingual program at the Von Humboldt School in Chicago, where Iris was a student. The testimony of both Klempner and Motolenich was substantially the same. In December 1974 Iris was transferred into the bilingual program from another classroom because she was having discipline problems. Iris adjusted very well to the new classroom and from the time that she first entered the bilingual program until the middle of February 1975 she presented no extraordinary problems of discipline. Between December 1974 and mid-February 1975, on one or two occasions, Iris came to school with bruises on her face. These bruises were not prominent, and Klempner stated that she thought the discoloration was caused by dirt. At the time, Iris asserted that the bruises were the result of fights she was having outside of school.

Toward the end of February the bruises began appearing more frequently; approximately twice a week Iris had fresh bruises or gashes on her face. About the same time Iris' discipline problems reappeared. Then, on March 13, 1975, Iris arrived at school with her face heavily bruised and "puffy." Iris stated to Klempner that these injuries were the result of her having run into a refrigerator. On the following Monday, March 17, 1975, Iris again came to school with fresh bruises on her face and arms. On both occasions the teachers referred Iris to the principal's office.

The State's next witness was James R. Short, the principal of the Von Humboldt School. Short claimed that on March 13, 1975, Iris was brought to his office with various bruises on her cheeks and forehead and with a bite mark in the middle of her forehead. After going through a series of stories, Iris finally stated that her brother Angel had bitten her on the forehead and had hit her on the top of the head with a hammer. After further questioning both Iris and Angel, who was also a student of the Von Humboldt School, the principal determined that the bruises on Iris' cheeks were caused by their mother. Short then had the mother come to school to verify the story. According to Short, the mother related the same general story as that given by the children, that some of the bruises were the result of a fight between Angel and Iris and that the other bruises were caused when she punished Iris for misbehaving.

The principal further testified that Iris returned to his office on March 17, 1975, with fresh bruises on her back and legs. At this time he had someone call the mother to request that she again come to school and to

inform her that the school was going to "report" these incidents. Mrs. Gomez did not come to the school this time.

Jorge Riba, a social worker and investigator with the Department of Family and Children Services, next testified for the State. He was responsible for the investigation of Iris' bruises pursuant to the school's reporting of the March incidents. Riba testified that he first visited Iris at school on March 18, 1975, and at that time the girl appeared to be a "disaster area." She had marks covering her body—on her legs, face and back and she was very dirty. He later met with Mrs. Gomez at her home, at which time Mrs. Gomez admitted striking her daughter for disciplinary reasons. As to the injuries which Iris had recently suffered, Mrs. Gomez stated that some of them were the result of Iris' having been jumped by gangs, some by her brother Angel, when he hit her on top of the head with a hammer, and some by her own hand when she was disciplining Iris because the girl had stolen $40 from the mother's purse.

The State's next witness was Evelyn Lyman, a social worker at a settlement house called the Erie Neighborhood House. According to her testimony, in June of 1974, Mr. Gomez came to request her assistance because his wife had taken some pills. Upon arriving at the house, she found Mrs. Gomez lying in bed. By shaking her, Lyman was able to make Mrs. Gomez conscious enough to indicate that she had taken some pills but after that Lyman could not arouse her at all.

Lyman also testified that during the summer of 1974 the Gomez children participated in the visitation program conducted by the Erie Neighborhood House. Under this program the children were placed with families in Indiana for a summer vacation. The children returned from Indiana on the day before Labor Day and Lyman accompanied them to their home. When they arrived, Mrs. Gomez was leaning against the door jam, barely able to stand up. Two days later, Mr. Gomez came to Lyman to request her assistance in having the children removed because his wife was taking too much medicine and was unable to care for the children. At that time, she again visited the home and found Mrs. Gomez in bed, acting as if she had taken an overdose of medicine. While Lyman talked to Mrs. Gomez about what she was going to do to better herself and to take care of the children, Mr. Gomez had Ricky relate, in front of his mother, that he had seen her take pills the previous day. Prior to leaving the home on this occasion, Lyman gave Ricky several dimes and told him to call her in case she was needed.

Almost immediately upon arriving back at the settlement house, Ricky called Lyman, claiming that his mother was chasing him around the house with a knife. She immediately returned to the Gomez residence. According to Mrs. Gomez, Ricky had been misbehaving so she told him to get up against the wall so that she could beat him. Ricky stated that his

mother had been taking her medicine and that he would not stand against the wall so that he could be beaten because he did not feel that he had done anything wrong.

Lyman also testified that she saw Iris during the last part of February or the first part of March 1975 at the settlement house. At that time, Iris had a black and blue mark on her left cheek which appeared to have been made by a strap.

The State's final witness was Ricky Gomez. Ricky testified that after his mother started to take her medicine, his mother and father would leave the house in the morning and would not return home until the next morning. While his parents were out all night, he would have to cook for his brother and sister and was responsible for all of the household chores. He stated that the medicine which she was taking was valium which his parents would secure by traveling around to various local physicains.

Ricky further testified that his parents would sometimes beat him and the other children for no reason, when they got mad or when they would "drink" the valium pills. He stated that these beatings were done with belts, sticks and wires, and that one time his mother had stabbed him with a fork. In addition, one one occasion his father had threatened to beat him with a wire from an automobile battery, but that his mother had intervened.

Ricky also related his version of the incidents which occurred on the day after Labor Day in 1974, when Lyman came to the house. He stated that he had lightly hit Angel after he had thrown shoes at him. His mother, then under the influence of valium, started chasing him around the house and ordered him to get up against the wall so that she could hit him with a belt. When he refused, she chased him around the house, first with a knife and then with a stick. At that point, he ran out of the house and called Lyman.

Henry Katz, a service worker with the Department of Public Aid, was the first witness for the respondents. He stated that during the two months prior to trial he had made five visits to the Gomez home. On none of these visits did Mrs. Gomez ever appear to be drunk or drowsy, although on one occasion she appeared to be nervous about something and was chain-smoking.

Lydia Gomez was the respondent's other witness. She testified that during 1975 she had been under the care of Dr. Santalla and had been taking medicine under his instructions. The purpose of the medicine was to make her gain weight, but that the medicine had no physical effect on her. She denied that she left home all night or that she left all the cooking and housecleaning to her son. She attributed the bruises on Iris' face to two or three beatings by three girls at school. She also testified that she did not notice any black and blue marks on Iris' face on either March 13 or

March 17. She further denied telling Riba that she hit Iris for disciplinary reasons or that she ever struck any of her other children. She denied ever stabbing Ricky with a fork or having chased him with a knife. While she recalled receiving a call from school in March 1975 concerning Iris, Mrs. Gomez denied ever telling school officials that she hit Iris.

Following closing arguments, the judge found that the State had proven the charge of neglect by a clear preponderance of the evidence and that it would be in the best interests of the children that they be adjudged wards of the court. A dispositional hearing was held on September 12, 1975, at which time the defense counsel offered into evidence a letter from Mrs. Gomez' physician, Dr. Santalla. In the letter the doctor stated that Mrs. Gomez had been admitted to St. Mary's Hospital on September 3, 1974, for abusing sleeping medication, which she had obtained from local physicians. The doctor also stated that she was not now abusing her prescribed medication. The State's attorney related a telephone conversation which she had with Dr. Santalla in which he again stated that Mrs. Gomez was no longer abusing her medication but that he could make no representation to the court concerning the care of the parents and the minor children. Finally, Mr. Gomez testified that he had received a letter from Social Security which informed him that he would be receiving a pension and thus would now be able to stay at home with the children.

The court, finding that the parents had failed to care for and maintain their minor children and had failed to promote their general interests, committed the children to the Department of Children and Family Services. Richard S. Laymon was appointed guardian and was given the right to place the children.

Initially, we must consider the issue of whether the court committed prejudicial error when it admitted evidence of Mrs. Gomez' misuse of drugs. The respondents contend that such evidence is irrelevant because it related to events occurring more than 6½ months prior to the filing of the neglect petition. The State counters with two alternative arguments. First, they suggest that the respondents did not object to the admission of that evidence on the grounds asserted on appeal and therefore have waived the argument. Second, the State asserts that even if the objection was not waived the evidence was properly admitted.

■■■ We believe that it is unnecessary for us to determine whether the question was waived for, even assuming that an objection was properly raised, we think that the evidence is clearly admissible. Evidence of the abuse of drugs which interferes with the ability of a parent to care for his children is relevant to the question of neglect. (*In re Stilley* (1977), 66 Ill. 2d 515, 363 N.E.2d 820.) Moreover, the mere fact that the evidence relates to events occurring 6½ months prior to the filing of the neglect petition and some eight months prior to the hearing on that

petition does not, by itself, destroy the probative value of such evidence. (See *In re Holmes* (1975), 28 Ill. App. 3d 104, 328 N.E.2d 35 (a finding of neglect based upon events occurring over three years prior to the hearing of the neglect petition).) While the age of this evidence may affect its weight, we cannot say, within the circumstances of this case, that it was improper for the trier of fact to consider the evidence of Mrs. Gomez' misuse of drugs.

The parents also contend that the evidence does not support the conclusion that the home environment was injurious to the Gomez children. In particular, they argue that the evidence relative to Iris' physical condition does not indicate that her home environment was injurious, that Ricky's testimony was incredible and thus may not be considered, and finally that the evidence of Mrs. Gomez' drug abuse is irrelevant.

■■ The question of whether children are neglected within the meaning of section 2—4 of the Juvenile Court Act is to be determined from the specific circumstances of each individual case. (*In re Stilley; People ex rel. Wallace v. Labrenz* (1952), 411 Ill. 618, 104 N.E.2d 769.) The State has the burden of proving neglect by a preponderance of the evidence and once this determination is made, the decision will not be overturned on review unless the judgment is against the manifest weight of the evidence. (*In re Stilley; In re Gonzales* (1974), 25 Ill. App. 3d 136, 323 N.E.2d 42.) In the present case, we do not believe that the finding of neglect is contrary to the manifest weight of the evidence.

■■ The evidence concerning the physical condition of Iris clearly supports the conclusion that her home environment was injurious. The evidence establishes that on a number of occasions Iris sustained serious marks and bruises on her body. On Thursday, March 13, 1975, Iris was so severely bruised that school officials felt compelled to send Iris to the hospital for an examination while calling her mother in to discuss the origin of the problem. On the following Monday, when Iris arrived at school with fresh bruises, school officials initiated a social investigation of the problem; Riba, who conducted this investigation, saw the girl the next day and described her as a "disaster area." The fact that the girl was not hospitalized because of these bruises is insignificant for there exists no requirement that such hospitalization is a prerequisite for the conclusion that a child is suffering neglect. We also do not accept the parents' argument that the finding of neglect is contradicted by the fact that the hospital failed to file a report pursuant to section 4 of the Abused and Neglected Child Reporting Act (Ill. Rev. Stat. 1975, ch. 23, par. 2054) for the school officials who are subjected to the same statutory duty had already notified the officials of the Department of Children and Family Services.

■■ The respondents suggest that the evidence does not show that the

injuries suffered by Iris occurred within the home. We cannot agree. While on several occasions Iris did state that she suffered bruises in fights with other school children, she also related that she was injured when she ran into the refrigerator at home, when her brother hit her with a hammer and when her mother physically punished her. When questioned by Short, Angel gave essentially the same explanations for Iris' bruises. Furthermore, Lyman, Riba, as well as Short, testified that Mrs. Gomez had admitted physically punishing her children. The fact that Mrs. Gomez later denied those admissions at the court hearing is unpersuasive for there exist other elements of incredibility in her testimony; for example, in the face of overwhelming evidence to the contrary, Mrs. Gomez stated that on March 13 or 17, she never even noticed that Iris was severely bruised. Thus, we feel that there exists substantial evidence to conclude that at least some of the marks on Iris' body were caused in her home.

■■ We cannot accept the respondents' characterization of the evidence of Iris' injuries as demonstrating only an isolated instance of careless and irresponsible behavior. The testimony of the school officials reveals that Iris came to school on a number of occasions with marks on her body. Ricky testified that physical punishment was meted out to the children by their parents on a regular basis. Furthermore, the events which occurred on the day after Labor Day 1974, further negate the conclusion that the occurrences in March 1975 were merely isolated instances of careless behavior.

■■ We also reject the respondents' argument that Ricky's testimony is incredible and thus must be disregarded. The trier of fact who has heard and seen the witness is generally in a better position to judge his credibility and its conclusion will not be disturbed unless it is contrary to the manifest weight of the evidence. (In re Garmon (1972), 4 Ill. App. 3d 391, 280 N.E.2d 19.) Here, where the evidence was corroborated to a significant degree by other testimony, we do not feel that we should completely discount the testimony of this witness.

We, of course, have previously rejected the respondents' final contention that the evidence as to the misuse of drugs by Mrs. Gomez is irrelevant. Considering the evidence as a whole, we believe that there exists sufficient evidence to support a finding of neglect and the adjudication of wardship.

For the above stated reasons, the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

McNAMARA and JIGANTI, JJ., concur.