*In re* C.L.T. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Judith Tabor, Respondent-Appellant).

Fourth District   No. 4—88—0808

Opinion filed June 21, 1989.

Diana Lenik, of Urbana, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Kenneth R. Boyle, Robert J. Biderman, and Rebecca L. White, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

The three minors, C.L.T., M.W.T., and M.J.T., were adjudicated abused in December 1985. By dispositional order, the circuit court of Champaign County made the minors wards of the court, and ordered their custody transferred to the Department of Children and Family Services (DCFS), along with power to place them. At a review hearing on October 24, 1988, the court continued its dispositional order with the following provision added. C.L.T. was allowed to choose which church she would attend, if any. Respondent, C.L.T.'s mother, appeals only that portion of the order relating to C.L.T.'s ability to choose her own religious training.

The cause involving these three minors has been before us on two previous occasions. (*In re C.L.T.* (4th Dist. 1989), No. 4—88—0408

(unpublished order under Supreme Court Rule 23); *In re C.L.T.* (4th Dist. 1989), No. 4—88—0673 (unpublished order under Supreme Court Rule 23).) We need not recite the entire background in order to deal with respondent's question. The pertinent facts follow.

This cause initially began as a result of an incident in which C.L.T. was punished for eating forbidden candy. She was 11 years old at the time, and her punishment was to be spanked on the buttocks 50 times with a wooden paddle. C.L.T. suffered severe bruising and some bleeding. Later, after the children had been involved in counseling, it was discovered the children had deep emotional scars left by respondent and her husband, Frederick Tabor. All of the children had very low self-esteem. In large part, this stemmed from the method of discipline used in the Tabor household. Respondent and Frederick attempted to achieve behavioral compliance by inflicting pain, oftentimes severe pain. At times, the wooden paddle was used and, at other times, a belt. As part of the family life-style, the children lived according to strict religious tenets.

After a period of time, a theme of excessive control appeared. Many of respondent's actions were viewed by DCFS counselors as attempts to exercise excessive control over the lives of her children. Respondent underwent a psychological evaluation prior to the October 24, 1988, hearing. The evaluator expressed concern over respondent's "need to control *** especially when it comes to her religion." After being removed from the family home, two of the children rebelled against respondent's life-style and expressed hostility to her. At a review hearing on May 4, 1988, it was noted that the oldest child, M.W.T., had ceased visitation with his mother. At that time too, C.L.T. expressed her desire to have visitation cease. Both children viewed the strict religious requirements as respondent's method of maintaining control over their lives. According to the review report prepared for the October 24 hearing, C.L.T. maintained little contact with her mother and expressed her desire to sever her ties with her mother's church as well. She was happy with her foster home and stated her desire to begin attending church with her foster family.

At the hearing on October 24, respondent expressed her desire to have the children maintain religious ties with her church. Respondent stated the control issue was, in essence, really one of following unchangeable church doctrine. The court disagreed:

> "It's a broader issue of control and control of all aspects of the children's life, personality, development, likes, dislikes, thoughts, words, and actions. It's the kind of desire, in fact, almost fanatic pursuit of control that led to many of the prob-

lems that have been encountered in this case including the on-going physical abuse.

The religious aspect of it, I believe, is an illustration, and it's an example of the issue. I don't believe it is the issue in and of itself. The Court does not sit to decide what religions are appropriate for children and what if any religions are not appropriate. That also is not the issue, in my judgment. Whenever any religion, any religion, either in and of itself or as applied by a parent, hurts a child or is other than in the best interests of that child, then I believe that religious practice must be suspended until such time as it no longer injures the child or until such time as the parents' use of that religion or implementation of that religion ceases to hurt the child. That would apply to any religious practice whatsoever of any denomination.

So, I view the religion as simply an illustration of those issues raised by Dr. Matthews and frighteningly documented in the history of this case."

The court allowed C.L.T., a 14-year-old, to attend the church of her choice.

■ On appeal, respondent argues her right to determine the religious training of her children has been improperly removed by the court. Clearly, the ability to worship God in one's accustomed style is a cornerstone upon which this country was built. (See U.S. Const., amend. I.) Our own State Constitution similarly guarantees religious freedom:

"The free exercise and enjoyment of religious profession and worship, without discrimination, shall forever be guaranteed, and no person shall be denied any civil or political right, privilege or capacity, on account of his religious opinions; but the liberty of conscience hereby secured shall not be construed to dispense with oaths or affirmations, excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of the State. No person shall be required to attend or support any ministry or place of worship against his consent, nor shall any preference be given by law to any religious denomination or mode of worship." (Ill. Const. 1970, art. I, §3.)

However, the freedom to exercise one's religious beliefs is not absolute. The Constitution of 1970 expressly limits religious freedom in those instances which interfere "with the peace or safety of the State." In *People ex rel. Wallace v. Labrenz* (1952), 411 Ill. 618, 625, 104 N.E.2d 769, 773-74, the court stated:

"Concededly, freedom of religion and the right of parents to

the care and training of their children are to be accorded the highest possible respect in our basic scheme. [Citations.] But 'neither rights of religion or rights of parenthood are beyond limitation.' *Prince v. Massachusetts*, 321 U.S. 158, 167; see *Reynolds v. United States*, 98 U.S. 145; *Jacobson v. Massachusetts*, 197 U.S. 11."

The Juvenile Court Act of 1987 (Act) (Ill. Rev. Stat. 1987, ch. 37, par. 801—1 *et seq.*) endeavors to protect the parental right to choose a child's religious training. Section 1—3(15) of the Act (Ill. Rev. Stat. 1987, ch. 37, par. 801—3(15)) gives certain residual rights and responsibilities to the parents of minors who come within the jurisdiction of the Act, and states, in part:

" 'Residual parental rights and responsibilities' means those rights and responsibilities remaining with the parent after the transfer of legal custody or guardianship of the person, including, but not necessarily limited to *** the right to determine the minor's religious affiliation."

The DCFS representative, at the hearing, stated the agency's policy of abiding by the wishes of the parent in such situations. In this case, DCFS was prepared to implement respondent's request to have C.L.T. attend respondent's church. There are no cases which specifically address the situation before us.

Our previous orders (*In re C.L.T.* (4th Dist. 1989), No. 4—88—0408 (unpublished order under Supreme Court Rule 23); *In re C.L.T.* (4th Dist. 1989), No. 4—88—0673 (unpublished order under Supreme Court Rule 23)) indicate in more detail the deep emotional scars left on C.L.T. and her siblings by both respondent and her husband. The excessive beating took place, as did a policy of severe restrictions. There was evidence of sexual abuse toward certain children of the family by both parents. We note that C.L.T., M.W.T., and M.J.T., while being natural birth siblings, were all adopted by respondent and her husband. While we support the obligation to respect and abide by the wishes of a minor's parents as to religious affiliation and training, we find the trial court's decision in this case was correct because of the exceptional circumstances.

The record supports the trial court's conclusion that the real issue was not religious training, but an attempt by respondent to maintain a control over C.L.T. that hindered the process of healing C.L.T.'s emotional and psychological wounds. Respondent's struggle with the issue of control has been identified by a professional psychologist as a destructive factor in her relationship with her children. This had been apparent to the court almost from the time of the initial dispositional

order in early 1986. The issue of control overlaps with respondent's right to train her children according to her religion. It appears to be in C.L.T.'s best interest to allow her to break free of the control. It was not an abuse of discretion to allow C.L.T. the freedom to choose her own religious training.

For the reasons stated above, the order of the circuit court of Champaign County is affirmed.

Affirmed.

McCULLOUGH, P.J., and KNECHT, J., concur.