NOTICE

Decision filed 07/18/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 220196-U

NO. 5-22-0196

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* J.M. and J.F., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21-JA-73 |
| | ) | |
| Anaysha M., | ) | Honorable |
| | ) | Brett N. Olmstead, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE MOORE delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The adjudicatory order of the circuit court of Champaign County that found J.M. and J.F. to be neglected and the subsequent dispositional order are affirmed because the circuit court's findings were not against the manifest weight of the evidence.

¶ 2    The respondent, Anaysha M., appeals the circuit court of Champaign County's January 24, 2022, finding that her minor children, J.M. and J.F., were neglected, and the March 14, 2022, finding that it was in the childrens' best interests to become wards of the court. The respondent properly raises one issue on appeal, and that is whether the State met its burden to prove that the minor children were neglected.[1] For the following reasons, we affirm.

---

[1]The respondent only challenges the finding of neglect entered in the adjudicatory order; however, the entry of the dispositional order was a prerequisite to the filing of an appeal.

1

¶ 3                                    I. BACKGROUND

¶ 4      This case began with the filing, on October 7, 2021, of *inter alia*, a petition for adjudication of abuse, neglect, or dependency, regarding Anaysha M.'s biological children, J.M., who was born in August 2014, and J.F., who was born in March 2010. Count I of the petition alleged the minors were "abused pursuant to 705 ILCS 405/2-3(2)(ii) by reason of being minors under 18 years of age whose parent, Anaysha [M.], creates a substantial risk of physical injury to such minors by other than accidental means, which would likely cause death, disfigurement, impairment of the physical or emotional health and/or loss or impairment of any bodily functions of the minors." Count II of the petition alleged the minors were "neglected pursuant to 705 ILCS 405/2-3(1)(b) by reason of being minors under 18 years of age whose environment is injurious to their welfare when they reside with Anaysha [M.] in that said environment exposes the minors to domestic violence."

¶ 5      The filing of the petition was precipitated by a domestic violence occurrence on October 1, 2021, at approximately 3 a.m. At the time of that event, law enforcement officers were dispatched to the respondent's apartment due to a violent physical altercation, that involved a knife, between the respondent and her then girlfriend, Tiamera. The same day, the respondent was placed under arrest and transported to jail.

¶ 6      On October 7, 2021, a shelter care hearing was held regarding J.M. and J.F. At the hearing, the respondent stipulated to probable cause and the immediate and urgent necessity for purposes of the shelter care hearing only. The same day, the circuit court entered an order finding the minors were neglected and abused and granting the Department of Children and Family Services (DCFS) temporary custody of J.M. and J.F.

¶ 7      On January 5, 2022, an adjudicatory hearing was held. The respondent was present at this hearing with her counsel. The following evidence was submitted.

2

¶ 8     Justin Prosser, a patrol sergeant with the City of Champaign Police Department, was the first witness called to testify by the State. Prosser testified that on October 1, 2021, at approximately 3 a.m., he was dispatched to an apartment complex for a house battery, unknown problem. Upon his arrival, he checked in with Officer Wilson and Officer Tatum who were already at the scene. Prosser then walked towards what was later identified as the respondent's apartment. He testified that he observed blood on the ground up and down the sidewalks. He described the blood on the sidewalks as a small amount. Prosser testified that upon his arrival at the respondent's apartment he observed "quite a large amount of blood on—outside that door." He observed blood outside the door, on the actual door to the respondent's apartment, and some on the surrounding siding and window.

¶ 9     Next, Prosser knocked on the respondent's apartment door, and he was granted permission to enter the apartment. Prosser testified that once he was inside the apartment he observed "[d]irectly inside is the living room area, and there was a good amount of blood on the floor and the wall." Once inside the apartment, Prosser spoke with a woman who identified herself as the grandmother of two of the three minors that were inside the apartment. He also testified that he briefly spoke with J.F. while her grandmother was present. Prosser testified that J.F. told him "that she saw her mother, Anaysha, and her mother's girlfriend—she called her Tia—engaged in a fight inside the apartment." After speaking with the individuals inside the apartment, Prosser testified that he exited the apartment and, in a parking space directly in front of the apartment, he observed a blue Ford SUV with all four tires slashed. He also observed blood on the rims.

¶ 10    Andrew Wilson, a night shift patrol officer for the City of Champaign Police Department, was the next witness called to testify by the State. Wilson testified that he was working on October 1, 2021, at approximately 3 a.m. when he was dispatched to a call because "someone was outside

knocking on doors bleeding grievously." Wilson testified that upon arrival at the scene, he heard some loud yelling and an individual outside that was bleeding from their hand. He approached the individual and identified her as Anaysha M. He observed that she was bleeding from a hand. He described the blood as "a significant amount of blood *** and the blood was significant enough that I believed that the ambulance should have been arriving for her."

¶ 11    After Wilson rendered first aid to the respondent, he spoke to her about what had occurred. Wilson testified that the respondent reported to him that she had been drinking earlier in the night with Tiamera at a different apartment complex. The respondent reported that she and Tiamera were in a relationship. Wilson testified that the respondent reported that while she and Tiamera were traveling to the respondent's apartment a verbal argument took place. Upon their arrival at the apartment, a physical altercation ensued that the respondent described as "tussling" between the respondent and Tiamera. Wilson testified that the respondent reported that while the "tussling" was occurring, the respondent called out for J.F. This resulted in J.F. coming to the area where the respondent and Tiamera were "tussling," and she was instructed to call her grandmother, the respondent's mother.

¶ 12    Wilson testified that the respondent had an injury to her hand that was bleeding profusely. He testified that "she stated that she was unsure [how she sustained the injury] but that the lacerations may have happened while she was outside. *** That [the lacerations] may have occurred while she was trying to get back into the residence." Wilson testified that the respondent reported that while she was outside she had knocked on the apartment door trying to get back inside. Once the respondent regained entry into the apartment, a second physical confrontation ensued between the respondent and Tiamera. The respondent reported that "Tiamera ended up on top of Anaysha and Tiamera struck Anaysha on the face." Following the punch to the face, the

4

respondent "stated that she stabbed Tiamera." The respondent's mother was able to end the confrontation between the two women.

¶ 13 Wilson also discussed Tiamera's vehicle, a blue Ford SUV, with the respondent. He "asked [the respondent] how Tiamera's vehicle sustained lacerations to the tires. *** [S]he stated that it may have been how she received injuries on her hands." The respondent also reported that the actions she had taken were to protect herself and her children. The respondent reported to Wilson that there was a history of domestic violence as she had been battered twice in the past. After Wilson concluded his interview with the respondent, she was transported to the hospital for evaluation of her injuries and she was later placed under arrest and taken to the local county satellite jail.

¶ 14 The next witness called by the State was Kady Ball, an investigator for DCFS. Ball testified that she was assigned to an investigation involving J.M. and J.F. and their parents on October 1, 2021. Ball's first contact with J.M. and J.F. was an in-person contact in the home of their maternal grandmother, on October 6, 2021. Ball spoke with J.F. in a private location without anyone else present. Ball testified that J.F. reported that "her mother and mother's girlfriend were in a fight and that her mother had been arrested and was in jail. [J.F.] had told me she was at home and her mother had been yelling for her so she came downstairs and saw her mom and Tiamera fighting and trying to grab each other's hands." Ball testified that J.F. also reported observing water on the floor. J.F. had been asleep and was confused and initially thought it was a joke when her mom was yelling for her. J.F. reported that she called her grandmother and then went back to the bedroom while her mother went outside and Tiamera was packing some things. Ball testified that she also spoke to J.M. He reported that he had been asleep when the events of October 1, 2021, transpired.

¶ 15    Ball testified regarding her conversation with the respondent that occurred over the phone on October 6, 2021. The respondent reported to Ball that she and Tiamera had been dating for about a year. Prior to the physical altercation, the respondent and Tiamera had traveled to Tiamera's aunt's home to "say happy birthday." The respondent did not like the atmosphere and thought people were talking about her behind her back. The respondent and Tiamera exchanged comments and then they left the aunt's home. The respondent reported that Tiamera was verbally aggressive with her in the car. The respondent stated to Ball that after arriving home at her apartment, the argument continued. The respondent reported wanting to go to bed, and that while in the bedroom Tiamera became physical with her by hitting her and pinning her on the bed. The respondent stated that the children were asleep but that J.F. showed up in the doorway of the bedroom and both respondent and Tiamera told J.F. to telephone her grandmother, who eventually arrived at the apartment.

¶ 16    Ball testified that she spoke with the respondent regarding her injuries. The respondent reported that her hand had been injured when Tiamera tried to stab her and the respondent grabbed the wrong end of the knife. Ball testified that she believed she and the respondent also discussed whether there was prior domestic violence. Ball stated that she believed the respondent reported that prior domestic violence had occurred.

¶ 17    Ball testified that she and the respondent also discussed where J.M. and J.F. were when she and Tiamera were at the aunt's home. The two minors were home at the respondent's apartment without any adult supervision.

¶ 18    A continuance of the adjudicatory hearing was then granted due to the unavailability of a witness due to COVID-19. The adjudicatory hearing resumed on January 24, 2022. Tyler Darling, a patrol officer with the City of Champaign Police Department, was the first witness called to

testify for the State. Darling testified that on October 1, 2021, he was dispatched to a domestic battery call with significant injuries being found on scene. Darling testified he was instructed to proceed to the hospital to take photographs for crime scene purposes. Darling testified he took photographs of Tiamera's injuries. The photographs were marked as exhibits one through five and were admitted into evidence. The State rested following Darling's testimony.

¶ 19    The respondent then testified on her own behalf. No other witnesses testified on behalf of the respondent. The respondent testified that she was the mother of J.M. and J.F. and that until October 1, 2021, the children resided with her. The respondent testified that on October 1, 2021, at approximately 3 a.m. an incident occurred between herself and Tiamera. The respondent testified that "Tiamera had been verbally, physically and mentally abusive to me." The respondent testified that the incident became physical and she was injured when "Tiamera tried to stab me and I grabbed the knife." The respondent testified that Tiamera was also injured, but that the respondent was "not sure" how Tiamera was injured. The respondent testified that she sustained an unprovoked attack with Tiamera being the aggressor. The respondent testified that she and Tiamera had been dating for approximately one year prior to the incident on October 1, 2021, and that said incident terminated the relationship.

¶ 20    On cross-examination, the respondent testified that she and Tiamera had been at Tiamera's aunt's house prior to the altercation, and both women had consumed alcohol at the aunt's house. The respondent testified that an argument started in the vehicle on their way from the aunt's house to the respondent's apartment. The argument then became physical in the bedroom of the respondent's home. The respondent then testified that she found herself underneath Tiamera, who is much larger than her, and that is when she called out for J.F. to call her grandmother. During cross-examination, the respondent denied reporting to law enforcement that her mother and

7

Tiamera worked to lock her out of the apartment and that she sustained lacerations to her fingers on her right hand while she was locked outside of the apartment. The respondent testified that she sustained injuries to her hand when she "grabbed the wrong end of the knife when [Tiamera] tried to stab me."

¶ 21 The respondent testified that Tiamera had locked her out of the apartment prior to her mother arriving. While locked out, the respondent began knocking on her own door and other doors of the apartment complex to get help. The respondent then testified that upon regaining entry to her apartment, at some point she was punched in the face by Tiamera and this is what prompted the respondent to defend herself with the knife. The respondent denied reporting to Officer Wilson that she stabled Tiamera while defending herself in the second physical altercation. The respondent denied knowing what happened to the tires on Tiamera's vehicle.

¶ 22 The circuit court issued its finding on the record and entered a written adjudicatory order on January 24, 2022, finding the minors to be abused or neglected as defined by section 2-3 of the Juvenile Court Act of 1987 (705 ILCS 405/2-3 (West 2020)) in that the minors were in an environment that was injurious to the welfare of the minors as defined by section 2-3(1)(b) of the Juvenile Court Act of 1987 (*id.* § 2-3(1)(b)). On the record, the circuit court indicated that it considered the evidence presented and the testimony of the witnesses. The circuit court observed "the demeanor of the witnesses while testifying and [gauged] that demeanor and all it says to the court about the credibility of the witnesses." The exhibits presented were also considered. The written adjudicatory order states as follows:

"This finding is based on the following facts: On October 1, 2021, Respondent Mother and her paramour, [Tiamera], engaged in a serious and dangerous physical fight in the home. One of the minors, J.F., came and stood in the doorway of Respondent Mother's

8

bedroom and saw the fight, and Respondent Mother and [Tiamera] told J.F. to call her grandmother to come help de-escalate the physical confrontation, as if that was a child's responsibility and as if the assistance needed was from J.F.'s grandmother. When the grandmother arrived, she and [Tiamera] recognized the danger presented by having Respondent Mother in the home at that time and locked her out. While outside Respondent Mother knocked on neighbors' doors to get help to re-enter her home. She also slashed [Tiamera's] tires. She eventually was able to regain entry and, still seeking to escalate the physical conflict, she stabbed [Tiamera] on her arm and face.

This was the most serious incident of domestic violence in the home, but not the only incident. Respondent mother and [Tiamera] had violence in their relationship on multiple occasions before October 1, 2021.

The State proved Count 2 of the Petition, but not Count 1."

¶ 23   Following the circuit court's order, this timely appeal followed.

¶ 24                                II. ANALYSIS

¶ 25   The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2021)) provides a step-by-step process to be used in determining whether a child should be removed from his or her parents and made a ward of the court. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004).

¶ 26   The first step of the process begins with the State filing a petition for wardship. *Id.* Then, a temporary custody hearing is conducted at which the court must "determine whether there is probable cause to believe that the child is neglected, whether there is an immediate and urgent necessity to remove the child from the home and whether reasonable efforts have been made to prevent the removal of the child or that no efforts reasonably can be made to prevent or eliminate

9

the necessity of removal." *Id.* If probable cause is found, the child is placed and temporary custody and the process continues. *Id.*

¶ 27    The second step of the process, the adjudicatory hearing, requires the court to determine whether the child was the subject of abuse, neglect, or dependence. *Id.* "Section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2000)) defines a 'neglected minor' to include 'any minor under 18 years of age whose environment is injurious to his or her welfare.' " *Id.* "Section 2-3(1)(d) of the Act (705 ILCS 405/2-3(1)(d) (West 2000)) also provides that a 'neglected minor' is 'any minor under the age of 14 years whose parent or other person responsible for the minor's welfare leaves the minor without supervision for an unreasonable period of time without regard for the mental or physical health, safety, or welfare of that minor.' " *Id.* The general definition of "neglect" is the " ' "failure to exercise the care that circumstances justly demand." ' " *Id.* at 463 (quoting *In re N.B.*, 191 Ill. 2d 338, 346 (2000), quoting *People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 624 (1952)). "Neglect" is not limited or fixed to this definition. By necessity, "neglect" is fluid and includes both willful and unintentional disregard of duty. *Id.* Similarly, "injurious environment" does not have a fixed definition, but has been interpreted to include " 'the breach of a parent's duty to ensure a "safe and nurturing shelter" for his or her children.' " *Id.* (quoting *In re N.B.*, 191 Ill. 2d at 346, quoting *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995)).

¶ 28    "At the adjudicatory hearing, 'the court shall first consider only the question whether the minor is abused, neglected or dependent.' " *In re A.P.*, 2012 IL 113875, ¶ 19 (2012) (quoting 705 ILCS 405/2-18(1) (West 2010)). "The legislature has stated that the purpose of an adjudicatory hearing is 'to determine whether the allegations of a petition *** that a minor under 18 years of age is *** neglected *** are supported by a preponderance of the evidence.' " *In re Arthur H.*, 212 Ill. 2d at 465 (quoting 705 ILCS 405/1-3(1) (West 2000)). "The plain language of this provision

instructs the circuit court to focus solely upon whether the child has been neglected." *Id.* "The legislature made no mention in this provision that during the adjudicatory stage of the proceedings the circuit court is also to determine who may be responsible for the child's neglect, and to assess the proportion of the blame with respect to such individuals." *Id.*

¶ 29   "[C]ases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances." *Id.* at 463. It is the State's burden to prove allegations of neglect by a preponderance of the evidence, meaning the State must prove the allegations are more probably true than not. *Id.* at 463-64. Neglect and injurious environment findings are fact driven. *Id.* On review, a finding of neglect will not be reversed unless it is against the manifest weight of the evidence. *Id.* at 464. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id.* This court will not disturb the circuit court's findings unless the record clearly demonstrates that the court should have reached the opposite result or that the court's determination is unreasonable, arbitrary, and not based on evidence. *In re D.W.*, 386 Ill. App. 3d 124, 139 (2008). If the State fails to prove the allegations of abuse, neglect, or dependence by a preponderance of the evidence, the petition must be dismissed. *In re Arthur H.*, 212 Ill. 2d at 464.

¶ 30   If a finding of abuse, neglect, or dependence is made, the third step is reached, at which point the circuit court must then determine whether "it is consistent with the health, safety and best interests of the minor and the public that he be made a ward of the court." 705 ILCS 405/2-21(2) (West 2020).

¶ 31   On appeal, the respondent argues the circuit court's finding of neglect was against the manifest weight of the evidence because the circuit court had no evidence that prior domestic violence occurred. The respondent also contends that the October 1, 2021, incident ended the

11

relationship between the respondent and Tiamera so the possibility of future domestic violence also ended.

¶ 32    Here, the circuit court's finding that the children were neglected because their environment was injurious to their welfare was not against the manifest weight of the evidence. Contrary to the respondent's assertions, the testimony of Officer Wilson and Kady Ball, at the hearing conducted on January 5, 2022, supports a finding that the domestic violence incident of October 1, 2021, was not the first time the children had been subjected to domestic violence in their living environment. Additionally, the respondent's own testimony confirmed that she involved J.F. in the domestic violence incident of October 1, 2021.

¶ 33    The respondent urges us to consider that the end of her relationship with Tiamera ends the possibility of future neglect by reason of exposure to domestic violence. However, at the adjudicatory stage, the circuit court was not tasked with determining who was responsible for the children's neglect, only whether a preponderance of the evidence established the children had been neglected. See *In re Arthur H.*, 212 Ill. 2d at 465.

¶ 34    The record in this matter does not demonstrate that the circuit court should have reached the opposite result. Nor does the record indicate that the circuit court's determination was unreasonable, arbitrary, or not based on evidence. Based on the evidence presented and considering the deference given to the circuit court in these matters, we find the circuit court's determination that the minors were neglected was not contrary to the manifest weight of the evidence, and we therefore affirm the circuit court's determination of neglect.

¶ 35    Lastly, we note that the respondent does not challenge the circuit court's finding that it was in the children's best interests to become wards of the court, and so that finding is also affirmed. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (points not argued are forfeited).

12

¶ 36                                    III. CONCLUSION

¶ 37    For the foregoing reasons, we affirm the judgments of the circuit court of Champaign

County.


¶ 38    Affirmed.