NOTICE

Decision filed 09/06/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 220218-U

NOS. 5-22-0218, 5-22-0219 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* J.E. and C.S., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Effingham County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 21-JA-29 |
| v. | ) | No. 21-JA-30 |
| | ) | |
| | ) | |
| Jasmine S., | ) | Honorable |
| | ) | Kevin S. Parker, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Cates and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The dispositional order of the circuit court of Effingham County is affirmed where the circuit court's finding that the minor children were neglected due to an injurious environment was not against the manifest weight of the evidence.

¶ 2    The respondent, Jasmine S., is the natural mother of J.E., born December 10, 2013, and C.S., born December 17, 2019. The respondent appeals the circuit court of Effingham County's April 6, 2022, dispositional order and its finding that her minor children, J.E. and C.S., were neglected due to an injurious environment. The respondent properly raises one issue on appeal, and that is whether the circuit court erred in finding that the minor children

1

were neglected due to an injurious environment. For the following reasons, we affirm the judgment of the circuit court.

¶ 3                                    I. BACKGROUND

¶ 4     On July 29, 2021, the State filed two juvenile petitions[1] pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2020)), regarding the respondent's biological children, J.E., born December 10, 2013, and C.S., born December 17, 2019.[2] Count I of each of the juvenile petitions alleged that the minor children were neglected as defined in section 2-3(1)(b) of the Act (*id.* § 2-3(1)(b)), by the reason of being minors under 18 years of age whose environment was injurious to their welfare, because the respondent had provided an unsafe living environment. The petitions further alleged that on July 27, 2021: (1) the respondent had a mental health episode resulting in her vehicle being left on the side of the road and the minor children running on the side of the road; (2) the respondent broke down and cried in front of an Effingham police officer and stated that she was hearing voices and they kept asking her questions; (3) the respondent stated that she was on medication but that she stopped taking her medication because it was killing the baby; however, St. Anthony's Hospital had confirmed that the respondent's pregnancy test was negative; (4) the respondent was incoherent and unable to take care of the minor children due to the respondent's mental state; and (5) the respondent had no form

---

[1]The juvenile petitions filed on behalf of J.E. and C.S. were also filed against both of the minor children's natural fathers; however, neither of the natural fathers' rights are at issue in this appeal.

[2]A juvenile petition was filed on behalf of J.E. in matter 21-JA-29 and on behalf of C.S. in matter 21-JA-30. The records indicate that the circuit court proceeded with the two separate cases as a single matter. As such, the majority of orders entered in these cases applied to both cases without separate findings concerning each minor.

of identification and could not provide information for herself, the minor children, or the fathers of the minor children.

¶ 5    Also on July 29, 2021, the State filed a motion to have the minor children placed in temporary custody of the Guardianship Administrator for the Illinois Department of Children and Family Services (DCFS) pending further hearing of the case and the circuit court conducted a shelter care hearing regarding J.E. and C.S. At the hearing, the circuit court heard testimony from Troy Bloemker, who testified that he was employed as a lieutenant with the Effingham Police Department. Lieutenant Bloemker stated that on July 27, 2021, he responded to a call at the business location of Air Stamping at 2610 North Third Street in Effingham, Illinois. The caller requested law enforcement to check on a woman and her children's welfare because the woman went to that location stating that she "needed help with democracy or help for democracy," and that she had two young children with her. Lieutenant Bloemker stated that he made contact with the respondent at the intersection of Third and Rickelman where the Pilot Truck Stop was located in Effingham. According to Lieutenant Bloemker's testimony, he observed the respondent and the children walking around the parking lot and in the grassy area near the roadway. At that point, Lieutenant Bloemker spoke with the respondent and verified that she and the children were the persons that had been in Air Stamping.

¶ 6    Lieutenant Bloemker testified that it took a few minutes to verify the respondent's identity. According to Lieutenant Bloemker's testimony, he asked the respondent her name, to which she told him "Jasmine," and she started to smile a little bit and to stare off into space. Lieutenant Bloemker stated that the respondent was having a difficult time

3

telling him who she was and her date of birth, adding that he did not believe that the respondent intended to provide him with her name and birth date. Lieutenant Bloemker stated that it was his belief that the respondent was having trouble coming up with her accurate date of birth; however, she did end up telling him her last name. Lieutenant Bloemker stated that he was also able to identify the minor children. Lieutenant Bloemker continued his testimony, stating that he tried to get a feel for the respondent's mental state by asking her exactly where she was coming from, how she got there, and where she was going. Lieutenant Bloemker testified that the conversation did not go very well, because the respondent was exhibiting signs of having a mental health crisis. These signs included the respondent answering questions with answers that Lieutenant Bloemker had not asked questions to. It appeared to Lieutenant Bloemker that the respondent was responding to the voices in her head, and she also could not tell him where her car was located. Lieutenant Bloemker stated that throughout the conversation with the respondent, J.E., who was seven years old at the time, was present and seemed to be more of the parent than the respondent in that J.E. was taking care of C.S. Also, J.E. was providing Lieutenant Bloemker with more information than the respondent was providing.

¶ 7    Lieutenant Bloemker also testified that C.S. was being a typical year-and-a-half-old child, running around playing in the grassy area near the highway. Lieutenant Bloemker stated that C.S. would run towards the highway, which is State Route 45 and has a speed limit of 45 miles per hour, and that semitrailers and trucks were present on the highway. Lieutenant Bloemker further stated that the speed limit increased to 55 miles per hour just up the road out in the more rural area and that the traffic went by quickly. Lieutenant

4

Bloemker testified that C.S. would run towards the roadway and that J.E. would keep C.S. from running into the roadway. Lieutenant Bloemker stated that the Pilot Truck Stop was also a bus stop, fuel station, and had a McDonald's restaurant. Because of this, there were cars coming and going in and out of the parking lot at all times. Lieutenant Bloemker observed C.S. darting towards the parking lot at different times, and during the entire time, J.E. was keeping C.S. safe.

¶ 8 Lieutenant Bloemker testified that the respondent was not aware what was going on nor involved in taking care of the minor children. Lieutenant Bloemker stated that there was a time or two when the respondent "kinda raised her arms and maybe her body would move like she wanted to go take care of her daughter as her daughter ran towards the road, but [J.E.] would go do it and stop her." Lieutenant Bloemker then stated that there were many times that C.S. would be running towards the roadway or parking lot and the respondent would be staring off into space or maybe talking to the voices in her head, and not responding coherently to him. Lieutenant Bloemker testified that as he and the respondent talked some more, he was identifying, from his training with crisis intervention training (CIT) patients, that the respondent was having a mental health crisis and was in need of psychiatric help. Therefore, Lieutenant Bloemker stated that he began asking whether the respondent was taking medications, but she never gave a complete answer, indicating that she was either on medications or had her medications changed.

¶ 9 Lieutenant Bloemker stated that he continued speaking with the respondent by asking her if she would be willing to talk to emergency medical services (EMS) about getting some help and possibly going to the hospital to speak with someone. The

respondent told Lieutenant Bloemker that she was willing to do that and, ultimately, Lieutenant Bloemker stated that he called for an ambulance transport to the hospital, where the respondent and the minor children were taken. It was Lieutenant Bloemker's opinion that, due to the respondent's state of mind, she was not able to care and provide for the minor children or for herself. Accordingly, Lieutenant Bloemker testified that he contacted DCFS.

¶ 10　Lieutenant Bloemker went on to testify that after some time, he was able to obtain names and dates of birth of the respondent and the minor children, and was further able to determine that the respondent was not from the area and was traveling to California from Evansville, Indiana. Apparently, the respondent was in a bad relationship with her significant other, the father of C.S., back in Evansville and was fleeing that relationship, attempting to go to California where her mother resided. Lieutenant Bloemker testified that this information was provided by J.E., rather than the respondent, and J.E. stated that C.S.'s father hits the respondent, and it was an abusive relationship.

¶ 11　Lieutenant Bloemker then testified that after arriving at the hospital, he realized that the respondent had inadvertently provided him with her wrong date of birth when the respondent was reviewing some hospital paperwork and corrected the date. Once Lieutenant Bloemker had the correct birth date, he contacted dispatch to run the respondent's information. It came back that the respondent and the two children had been listed as missing persons. Lieutenant Bloemker testified that he then contacted Evansville Police Department and spoke with a Sergeant DeYoung, who informed him that the

6

missing persons report was filed by C.S.'s father. Lieutenant Bloemker lastly testified that the respondent was admitted to the hospital and that DCFS was contacted.

¶ 12    The circuit court then heard testimony from Kaylyn Nalewajka, a child protection specialist with DCFS. Nalewajka stated that she had responded to the emergency hotline call on July 27, 2021, which reported that the respondent and her minor children were in danger. The hotline call alleged that the respondent was possibly having a mental health break and that there was a substantial risk of physical injury. Nalewajka stated that she went to St. Anthony's Hospital where she made contact with the respondent's treating nurse and Lieutenant Bloemker. The nurse informed Nalewajka that the respondent was staring off into space, was not making sensible statements, and that she had stated that she stopped taking her medication because it was killing her baby. Nalewajka testified that the respondent had made comments to the nurse that the "Spanish side hurt her" and other things of that nature. Nalewajka stated that the nurse confirmed that the respondent's pregnancy test was negative, that there was no alcohol in her system, and that a completed CT scan was normal.

¶ 13    After she spoke with Lieutenant Bloemker and the nurse, Nalewajka testified that she attempted to speak with the respondent. Nalewajka asked the respondent her name and date of birth, as well as the children's names and dates of birth, but the respondent was unable to make any sense or comprehension of these questions. Nalewajka stated that the respondent's eyes would roll into the back of her head, she would slump over, could not stay awake, and was not alert at all. The nurse provided Nalewajka with the emergency contact information of a "Howard" and "her friend Jenna" from the respondent's medical

chart from Deaconess Hospital in Evansville. When asked if she knew who "Howard" was, the respondent stated that he hurts and hits her. Nalewajka was ultimately able to determine that "Howard" was the father of C.S.

¶ 14 According to Nalewajka's testimony, the respondent's statements were broken, were not full sentences, and were just bits and pieces. The respondent was able to communicate that "Jenna" was her friend that resided in Florida, but she was unable to provide Nalewajka with any family members, telephone numbers, or contact information. Nalewajka attempted to contact "Howard," but it seemed that his telephone was "out of minutes" and she was not able to leave a voicemail or text the telephone number. Nalewajka later contacted the Evansville Police Department to have them conduct a welfare check for "Howard," but they were unable to make contact.

¶ 15 Nalewajka testified that, as the night went on, she spoke with the minor children and that the nurse suggested to Nalewajka that the respondent was unable to care for the children. The nurse indicated that the respondent was possibly looking at some psychiatric treatment. Nalewajka then testified that she was able to confirm that the respondent was being treated at OSF Heart of Mary Medical Center in Urbana, Illinois. Nalewajka did not know what the care plan for the respondent was at that time, since it was difficult to make contact with the social worker at the Medical Center that morning, and further, the respondent had not provided a release to Nalewajka in order for Nalewajka to speak with the social worker or obtain any information. Nalewajka then testified that the respondent had signed a release for the social worker at the hospital and provided her with Nalewajka's

contact information. However, to Nalewajka's knowledge, Mary Medical Center did not have any plan for the respondent.

¶ 16    Nalewajka stated that on July 27, 2021, she took protective custody of the minor children at the hospital and informed the respondent that Nalewajka would care for the minor children, make sure they were safe, and do whatever was needed to keep them safe. Nalewajka was not sure that the respondent comprehended or understood that. When told that DCFS was taking protective custody of the minor children, the respondent started speaking about God and "how she doesn't feel the weight on her shoulders that she doesn't have to be God any more [*sic*]."

¶ 17    At the end of the testimony, the circuit court found that there was probable cause that the minor children were neglected, and that there was an immediate and urgent necessity for the children, and it was in the best interests of the children, to be placed in shelter care. Further, the circuit court found that there were no reasonable efforts at that time that could be made to allow the children to remain in the home. Accordingly, the circuit court granted shelter care to DCFS. The circuit court entered a written temporary custody order on July 29, 2021.

¶ 18    On August 4, 2021, the State filed an amended petition for adjudication of wardship in each case, containing the same allegations as the original juvenile petitions, but adding updated information about the identity and whereabouts of the father of C.S. in 21-JA-30. On the same date, the circuit court conducted a first appearance hearing, and the respondent was present *pro se*. The circuit court advised the respondent of the allegations contained in the amended juvenile petitions and that a shelter care hearing was conducted with

temporary custody and shelter care being found appropriate for the minor children. The respondent stated that she understood the allegations, but that "none of that happened." The circuit court then advised the respondent of her rights and the proper admonishments, and she stated that she wished to represent herself. After the circuit court made more inquiries of the respondent, she indicated that she would accept appointed counsel.

¶ 19 On August 9, 2021, the circuit court entered an amended temporary custody order in each case, *nunc pro tunc* to July 29, 2021, that specifically found that probable cause existed for the filing of the petitions in that the respondent was "unable to care for children based on an apparent mental health crisis; children unattended on highway." The circuit court further found that there was an immediate and urgent necessity to remove the children in that the respondent was "unable to care for children; father status unknown." The order also specifically granted temporary custody to the Guardianship Administrator of DCFS who was authorized to place the minor children and consent to major medical care.

¶ 20 On August 18, 2021, DCFS filed its parent child visitation and contact plans with the circuit court, stating that visits once a week for two hours were intended to aid in the reunification between the respondent and the minor children. On September 13, 2021, DCFS filed its family service plan with the circuit court. The family service plan described in great detail the reasons and circumstances that led to the minor children being taken into protective custody as well as the risk factors that were present when the case was opened. The family service plan noted that, at the hearing on August 4, 2021, the respondent stated that "none of this happened and she was fine." The permanency goal was return home within 12 months in order to allow the respondent to correct the conditions that led to the

minor children being taken into protective care. It was also noted that the respondent would cooperate with DCFS to successfully complete services in order to have the minor children returned to her. This included, *inter alia*, the respondent's participation in an integrated assessment and comply with any recommended treatment, the respondent's participation in a mental health and an alcohol/drug use assessment/evaluation in order to determine the level of service required to address her mental health and alcohol/drug issues and to follow up with any recommended treatment, and the respondent's participation in parenting classes. Other recommended services for the respondent were also listed by DCFS within the family service plan. The respondent signed and acknowledged that she received a copy of the family service plan on September 1, 2021.

¶ 21 On September 1, 2021, the circuit court conducted another first appearance hearing, and the respondent was present with appointed counsel. The respondent denied the allegations in the amended petitions and requested that the matter be set for an adjudicatory hearing. On October 13, 2021, the case was called by the circuit court for an adjudicatory hearing; however, the respondent's appointed counsel informed the circuit court that the respondent desired to retain private counsel and, therefore, requested a continuance. The circuit court explained that the adjudicatory hearing was being continued at the request of the respondent and, therefore, the delay time would be charged to her and not against the State. After some discussion, the respondent acknowledged that she understood and agreed to this. Accordingly, the matters were set for a status hearing on December 1, 2021.

¶ 22 On October 15, 2021, the State filed its second amended juvenile petition for adjudication of wardship in 21-JA-29, containing the same allegations as the original

11

juvenile petition, but naming J.E.'s father and providing his address, and deleting the allegation that the father's whereabouts were currently unknown. On November 29, 2021, a petition to intervene was filed by Erica Balom, the paternal grandmother of J.E., in the same matter. On December 1, 2021, the circuit court called the case for a status hearing and referenced the petition to intervene. Counsel for the proposed intervenor explained to the circuit court that the petition to intervene could not proceed until after adjudication. After some discussion, the respondent requested the matter proceed to an adjudicatory hearing. The circuit court noted, however, that the matter had been continued by agreement to this date for first appearance with counsel and pretrial. The circuit court set the adjudicatory hearing for January 12, 2022.

¶ 23    On January 12, 2022, the circuit court conducted an adjudicatory hearing. The respondent's appointed counsel continued to represent the respondent. The circuit court heard testimony again from Troy Bloemker, who testified that he was employed as a lieutenant with the Effingham Police Department and had been with the department a little over 25 years. Consistent with his testimony from the shelter care hearing on July 27, 2021, Lieutenant Bloemker stated that he was dispatched to the business of Air Stamping on North Third Street in Effingham for a call of a suspicious subject that had come into the business requesting "help for democracy." Lieutenant Bloemker testified that he had responded to the area of the Pilot Truck Stop and located the respondent and the two minor children. Lieutenant Bloemker identified the respondent as being present in court. Lieutenant Bloemker further testified that he guessed the children's ages as five to seven for the little boy and two for the little girl. Lieutenant Bloemker stated that he approached

12

the respondent and began talking with her to determine what was going on, to see if she needed any help, and to see why they were receiving calls about the respondent asking for "help for democracy."

¶ 24    Lieutenant Bloemker testified that while he spoke with the respondent, she seemed to be distracted by voices that were not there. There were times when Lieutenant Bloemker would ask the respondent a question, and she would start to answer the question, but then she would stop and just smile, or she would respond like she was talking to someone else. Further, Lieutenant Bloemker stated that the respondent would respond to something that had nothing to do with the questions asked. Lieutenant Bloemker explained that he had been to CIT training in the past and that some of the indicators that the respondent was displaying were indicators that she was having mental health issues. Lieutenant Bloemker stated that as he continued to talk with the respondent, some of the things she would say did not make sense and she seemed to be having a break from reality. According to Lieutenant Bloemker's testimony, at one point, the respondent, out of nowhere, dropped down to her knees and began crying hysterically. Then after just a short period of time, maybe 30 seconds or so, the respondent stopped crying, stood back up, and began talking again like she had before; never showing that she was aware that she had been crying or was upset.

¶ 25    Lieutenant Bloemker testified that he was able to determine how the respondent came to Effingham but that it took a while since she could not tell him where her car was located or how she got there. Lieutenant Bloemker continued that he found the respondent in the grassy area in from of the Pilot Truck Stop next to Highway 45. Lieutenant Bloemker

stated that he was concerned because, as he and the respondent were talking, C.S. kept running around and would dart towards the highway. C.S. would also dart towards the busy parking lot. Lieutenant Bloemker estimated that it was somewhere between 12:30 and 1 p.m., and that there were a lot of people present at the McDonald's restaurant. Lieutenant Bloemker stated that he was afraid C.S. would run into the road or parking lot but, fortunately, J.E. was there to help bring C.S. back, corral her, and keep C.S. from running into the roadway or parking lot.

¶ 26 Lieutenant Bloemker stated that, when he initially made contact with the respondent, it took a while to figure out who she was since she had no identification and, either incorrectly or inadvertently, provided him with a wrong date of birth. Lieutenant Bloemker stated that while he was speaking with the respondent, J.E. kept interrupting saying he wanted something to eat. According to Lieutenant Bloemker's testimony, J.E. was showing a lot of concern for being hungry and wanting something to eat. Lieutenant Bloemker asked the respondent if the children had eaten, and he could not recall if it was the respondent or J.E. that told him that they had gotten something to eat when they were at Walmart earlier in the day. Lieutenant Bloemker testified that he was eventually able to locate the respondent's vehicle on the northbound side of Interstate 57 near the Watson-Mason exit.

¶ 27 Lieutenant Bloemker further testified that he had asked the respondent about any medications she was on, but never got a straight, correct answer as to what kind of medication she was taking. Lieutenant Bloemker remembered from the conversation that the respondent had indicated that she was on some medications, but that she could not tell

14

him what kind, whether she was taking them, or whether she had run out. Lieutenant Bloemker stated that he had asked the respondent if she would agree for an ambulance to come and speak with her to get some help and maybe go to the hospital and to talk with a doctor for her mental health issues, to which she agreed. Lieutenant Bloemker stated that he was at the hospital while the respondent was there speaking with the medical staff but was "kinda in and out" because he was trying to piece everything together and figure out exactly why the respondent and the children were there, what was going on, and to contact the proper people. According to Lieutenant Bloemker's testimony, he was able to obtain a "clearer picture" of the situation with the help of what the respondent had said to the nurse at the hospital, along with a few things J.E. had stated.

¶ 28    Lieutenant Bloemker stated that, at that time in the hospital, it was indicated that the respondent was fleeing an abusive relationship and that she had driven her car with the intention of going to California to stay with her mother. The respondent's car, however, broke down just south of Effingham where a passerby picked her and the children up and gave them a ride to town. Lieutenant Bloemker testified that his recollection was that the respondent and the children were then dropped off in the area of Walmart, but he did not know whether they walked or got another ride to the Pilot Truck Stop. Lieutenant Bloemker did state that it was a couple miles from Walmart to the Pilot Truck Stop. He also stated that he was able to obtain the respondent's and the children's correct information after providing dispatch with the respondent's license plate number. This allowed dispatch to obtain all of the correct information, and alerted dispatch that the respondent and the minor children were listed as missing persons from Evansville, Indiana. Lastly, when asked if the

15

respondent had said anything else that caused him concern, Lieutenant Bloemker testified that some of his concerns were from the respondent not knowing where her car was located, that the respondent had indicated that she had $40 on her person and was a long distance from home, and that the respondent could not provide anybody's information to contact in order to help her or the minor children. Lieutenant Bloemker opined that it did not appear that the respondent was in shape to take care of the minor children or herself at that time.

¶ 29    On cross-examination, Lieutenant Bloemker reiterated that the respondent had $40 but that she did not have her purse or any identification on her person. Lieutenant Bloemker stated that he did not know if any identification was found in the respondent's car when it was recovered. Lieutenant Bloemker acknowledged that the different highways and interstates crossing in the Effingham area have led to travelers getting turned around and lost in the area. Lieutenant Bloemker did not determine whether the respondent's car had run out of gas. Further, Lieutenant Bloemker reiterated that J.E. was begging the respondent for something to eat while in the McDonald's parking lot. Lieutenant Bloemker acknowledged that he did not hear all of the conversation between the respondent and the nurse in the hospital, that he was dressed in his uniform and driving a marked squad car when he encountered the respondent, and that none of the interaction between himself and the respondent was captured on bodycam or a camera in his squad car.

¶ 30    Lieutenant Bloemker testified that he had determined the father of C.S. while speaking with the nurse and then later, while speaking with Sergeant DeYoung with the Evansville Police Department, Sergeant DeYoung informed him that C.S.'s father had reported the respondent and minor children as missing persons. Lieutenant Bloemker stated

16

that he did not record in his report when the missing persons report was made by C.S.'s father. Further, Lieutenant Bloemker stated that he did not determine how long the respondent had been missing before she was located in Effingham. Lieutenant Bloemker acknowledged that it was J.E., not the respondent, who provided the information that the respondent was fleeing domestic abuse. Lieutenant Bloemker stated that he was unable to determine whether that was factual or not. Lieutenant Bloemker was asked what things the respondent said that did not make sense. Lieutenant Bloemker stated that there was nothing specific during the 10- to 15-minute conversation he had with the respondent, but there was a lot of rambling and nothing that really answered many of his questions. He further stated that the respondent was "somewhere in between" in her responses or was unresponsive to his questioning.

¶ 31    Lieutenant Bloemker testified as to his CIT where he was trained regarding people who were having mental health difficulties, such as hearing voices inside their head, and in those circumstances, he was trained to give the person time to sort through what the person was saying and what the voices in the person's head were saying. According to Lieutenant Bloemker's testimony, the respondent was attempting to respond but was having difficulty, so he recognized that and gave her time to sort through it. Lieutenant Bloemker stated that he was able, at times, to get an answer after a little bit of time had elapsed; however, at times, the respondent would respond with answers that had nothing to do with the questions he had asked. Lieutenant Bloemker testified that this seemed like "maybe the voice in her head was asking her a different question or saying something to her."

17

¶ 32   Lieutenant Bloemker continued, stating that during their conversations, "[i]t was nothing completely consistent." Lieutenant Bloemker testified that the respondent made eye contact with him at times but, at other times, her head would go back and forth, and she would look down. According to Lieutenant Bloemker's testimony, the respondent would look at her hands, look at the surroundings, sometimes make eye contact, and sometimes not. When pressed further on this subject, Lieutenant Bloemker referenced his CIT training, driving under the influence training, and years of experience dealing with people under the influence of drugs. Lieutenant Bloemker opined that the verbiage the respondent was using and the manner in which she talked indicated more towards her having a mental health crisis rather than being under the influence of drugs. Lieutenant Bloemker did not recall asking the respondent questions about the $40 and whether that was sufficient funding for her intentions but stated that, from his experience, $40 would not be sufficient for a journey to California. Lastly, Lieutenant Bloemker testified that he did not know if the respondent was subjected to any chemical testing and that he did not observe anything out of the ordinary with reference to the pupils of her eyes.

¶ 33   Next, the circuit court again heard testimony from Kaylyn Nalewajka, a child protection specialist with DCFS, who testified she had been employed with DCFS for one year. Nalewajka identified the respondent in court and stated that she first met the respondent and the minor children on July 27, 2021, at St. Anthony's Hospital, after DCFS received a hotline report on the family. Nalewajka stated that when she spoke with the respondent at the hospital, the respondent could not state her name, the minor children's names, or their birth dates. Further, Nalewajka stated that the respondent could not provide

anyone's contact information or how Nalewajka could contact any of the respondent's family. Nalewajka testified that she asked the respondent where she and the minor children were traveling to and where her car keys were located, and Nalewajka stated that she believed the respondent said they were going to California from Indiana.

¶ 34    Nalewajka further stated that she was able to obtain "[v]ery little" information from the respondent. Nalewajka continued her testimony stating that she was able to speak with J.E. at the hospital who advised Nalewajka that the respondent woke the children up in the middle of the night and told them that they were leaving due to "guns being in the home or guns being outside." J.E. told Nalewajka that the family was going to meet their cousins in California. J.E. denied ever seeing a gun but stated that he did "find a bullet one time that appeared to be a shotgun bullet and it had blood on it." When asked by counsel if J.E. advised Nalewajka what the respondent's motives were, Nalewajka stated that she recalled J.E. saying that "his dad is mean to his mom." Nalewajka did not recall if J.E. told her what the family came with when they left Indiana. Nalewajka further stated that J.E. did not have a lot of information but that he did state that the family was traveling from Indiana to California, they slept in the car, that the car broke down on the interstate, and that the car had run out of gas.

¶ 35    On cross-examination, Nalewajka stated that she had spoken with J.E. at the hospital, that C.S. was present there, and that she took notes during the conversation. Nalewajka stated that J.E. informed her that J.E. lived in Indiana but did not say what city, and that the family was going to California. Nalewajka testified that she spoke with J.E. in the late afternoon, that J.E. stated they slept in the car, and that it sounded like the family

19

had left Indiana early in the morning of that same day. Upon further questioning, Nalewajka acknowledged that the "dad" referred to by J.E. was C.S.'s father, and that it was the two minor children who slept in the car. Nalewajka did not clarify or distinguish from J.E. whether he meant the two minor children or the minor children and the respondent. Nalewajka further stated that she was unaware if the respondent had any plan for how she would get any help in California and stated that the respondent did not have a telephone with her.

¶ 36    At the close of the State's case, the respondent's counsel orally moved to dismiss the matter, arguing that the State had failed to make a *prima facie* showing by a preponderance of the evidence that the minor children were abused or neglected as alleged in the juvenile petitions. The State responded by pointing to the testimony presented by Lieutenant Bloemker and Nalewajka regarding the circumstances in the case. The circuit court noted that, considering the respondent's motion and the evidence adduced in the light most favorable to the State, simply showing the existence of a mental illness is not enough. Rather, the circuit court stated that there must be a showing that the mental illness created an injurious environment for the children. The circuit court also noted that it had not heard any mental health expert testimony but that it had heard sufficient evidence of the respondent's actions to at least, by a preponderance of the evidence, believe that she was laboring under some severe, at least acute, mental disturbances. Further, the circuit court stated that it had found the testimony of Lieutenant Bloemker to be credible based upon his CIT training. Accordingly, the circuit court denied the respondent's motion for a directed finding.

20

¶ 37    The respondent then testified on her own behalf. The respondent stated that she was 27 years old, resided in Evansville, Indiana, with C.S.'s father, and was the mother of the minor children. The respondent named the minor children and gave their respective birth dates. She continued her testimony stating that C.S. had resided with her for the child's entire life but that there were past custody disputes regarding J.E. with the child's father in Indiana. J.E., however, was always in her custody with parenting time being established through the courts. The respondent stated that on July 27, 2021, she was traveling through the country to get from Evansville to California. The respondent stated that she had left very early in the morning, maybe 3 a.m., because it was a long drive and she believed it to be safer to drive at night due to there being less vehicles on the road. The respondent stated that she had not been driving very long before she got to Effingham, maybe two hours, when she noticed that the car was running out of gas. The minor children were with her but were sleeping, which she expected since it was early in the morning. The respondent stated that she was paying attention to her driving.

¶ 38    The respondent continued by stating that the children were hungry because it was breakfast time, early in the morning. The respondent explained that it was around the time the sun was barely coming up and that she had money on a debit card that she left in the vehicle when she met an elderly couple who had stopped ahead of her vehicle. The couple got out of their vehicle and asked the respondent if they needed help, to which she replied "yes," that her car had run out of gas, and that she did not know where a service station was located. Counsel asked the respondent how her running out of gas on the interstate in a place she was unfamiliar with made her feel, to which she replied that she had an increase

in anxiety because it was dark, and she had never visited any cities in Illinois. According to the respondent's testimony, it was "[v]ery stressful." The respondent further stated that when the car actually did run out of gas, and she was on the side of the interstate, she felt vulnerable.

¶ 39   The respondent testified that the elderly couple drove her to Effingham, gave her $40, and told her "good luck." The respondent explained that she believed the couple was going to "make like a round trip, so I left my personal items in the car," including her purse. The respondent acknowledged that, in hindsight, it was a mistake on her part to be "ill prepared *** for unexpected things to happen *** while traveling." The respondent continued her testimony stating that the couple drove her and the minor children into town to "like a pavilion shopping center" where there was a Walmart and a lot of restaurants nearby. The respondent stated that she then walked with the minor children and talked to people who had vehicles, asking them "like hey can you help me locate my vehicle?" The respondent acknowledged that she was lost with the minor children and that even if she had found transportation, she had no idea how to get back to her car. Therefore, the respondent stated that she was hoping to find a local person to give her some assistance. The respondent stated that this made her even more stressed since all she had was "the $40 that the couple had given [her] and [she] used part of that to get them to Wal-Mart."

¶ 40   The respondent then testified that she had encountered Lieutenant Bloemker and that she was relieved when he had approached her. The respondent stated that she was relieved to see a man in uniform who she felt she could trust, not only because of his uniform, but also because she had family who looked like Lieutenant Bloemker. The

22

respondent stated that she opened up to Lieutenant Bloemker because he asked her personal questions about her family and their mental health history. The respondent stated that she told Lieutenant Bloemker that her mother was living in the streets and dealing with addiction. She also told Lieutenant Bloemker that her younger brother, since a very early age, was exposed to opiates and had very recently been diagnosed with schizophrenia. The respondent testified that she believed that Lieutenant Bloemker took this information and fabricated his report using her family's history.

¶ 41   The respondent denied hearing voices in her head while interacting with Lieutenant Bloemker and, further, denied that she had ever heard voices in her head. Counsel asked the respondent, based upon her brother's diagnosis, if she knew what it meant for a psychologist to say that a person was responding to internal stimuli. The respondent responded that her brother had lived with her and C.S.'s father for about six months and that his behavior was "like he was talking to ceiling fans and ovens and things like that." The respondent continued, however, stating that she never had such an experience and that "[w]hen I talk I talk to people." Upon further questioning, the respondent agreed that she did not have voices or any other stimuli in her head that did not actually exist that compelled her to do things or distracted her from the moment. The respondent testified that, from what she knew about psychology, everyone has an internal thought process that they go through when they are making decisions in any situation. The respondent stated that she did not believe she had a mental illness. She further stated that, other than the recent admission to the hospital, she had never been treated for a mental illness in her life and had never been prescribed medication for any sort of mental illness.

23

¶ 42    Counsel then asked the respondent if she had ever taken psychiatric medication to which she replied: "At the hospital I—off these recommendations, I tried one of their pills and it felt like my brain was on fire." Counsel continued asking, other than the one recent time in the hospital, had the respondent ever taken antidepressants, antipsychotics, tranquilizers, benzodiazepines, Xanax, or Valium, to which she indicated that she had not. Counsel then asked if, other than the one recent time in the hospital, had the respondent ever been evaluated for a mental illness. The respondent stated that after giving birth, an OBGYN evaluates a woman for postpartum depression and "[t]hings like that." The respondent continued her testimony stating that, other than the evaluation for postpartum depression, she had never had a psychiatric evaluation, seen a therapist, seen a substance abuse counselor, or attended an alcoholic or narcotics anonymous meeting before this case. She further stated that she had never abused alcohol or drug substances and was not under the influence of any drug substance when she encountered Lieutenant Bloemker. Lastly, the respondent testified that she did not believe the circumstance on July 27, 2021, created an unsafe or injurious environment for her minor children because, up until the time the ambulance was called, she was keeping the minor children by her side and limiting her contact with people "to like reputable businesses in the area" or "like people who were shopping inside Wal-Mart." The respondent stated that she felt like she "was trying to choose safe people to interact with in order to get me to my vehicle."

¶ 43    On cross-examination the respondent denied telling the nurses in the emergency room that she had stopped taking her medication and further denied that she had ever been prescribed a medication in her life. The respondent was asked "not one single medication

24

ever?" to which she replied that she took Tylenol while pregnant. The respondent further testified that it had only been a couple of hours since she had left her home when her vehicle broke down. She stated that she was going to California to her sister's home. The respondent explained that she had started a business and that her sister was a successful photographer in California, so she was traveling to be mentored by her sister. The respondent stated that she resided with C.S.'s father in Evansville and was taking the minor children to California with her because the father worked a full-time job and they had not established day-care or school because it was summertime. The respondent stated that her sister had two children around the same ages as J.E. and C.S. The respondent continued stating that since she and her sister were working on their business, and her father was having some health issues, the respondent "was just going to be down there for family support and enroll my children into the school that her children were in."

¶ 44 When asked how far C.S. got away from the respondent while she was speaking with Lieutenant Bloemker, the respondent replied that she was holding C.S. but that the child was very restless and was kicking and getting fussy. Therefore, the respondent stated that she let C.S. down to play and stretch her legs. According to the respondent's testimony, when C.S. would get a little far away, the respondent would direct J.E. to "please get your sister or I would get distracted and walk away from the officer." The respondent stated that C.S. would not get more than two or three feet from her. Upon further questioning, the respondent acknowledged that her car did not break down; rather, it had run out of gas; that she was given $40 by the elderly couple who dropped her off in Effingham; and that she then went to Walmart. The respondent stated that, at Walmart, she had bought the minor

25

children fruit and granola bars. The respondent stated that she had put the change in the bag but that she was unsure where the change ended up. The respondent stated that she believed "that's where the key got lost as well, because I just—that's all I had on me was just the bag and then the food in there and then it was just... I just lost it." The respondent stated that she did not have the bag or her keys, because the keys were in the bag when she spoke with Lieutenant Bloemker. The respondent continued stating that no one ever found the car keys or helped her find her car. Further, the respondent stated that she did not have a purse but had a wallet, that a debit card was in the wallet, and that she left those items in her vehicle. The respondent stated that there was a balance on the debit card.

¶ 45 Upon further questioning, the respondent testified that her car was located by someone else, that it was impounded, and that "for eight days I was a missing person." She stated that upon her release from the mental health facility, after signing "the release form," she walked from Champaign Urbana, Illinois, asking for assistance from local people to help her obtain a train ticket to Effingham. Upon her return to Effingham, the respondent located the impound lot where her vehicle was located and paid $600 for the time it was impounded. The respondent stated that her wallet and debit card were in the vehicle's glove compartment. Counsel asked the respondent about her testimony that she was a missing person for eight days and when she first provided her name to anyone after that happened. The respondent replied that she provided her correct name and birth date to Lieutenant Bloemker. The respondent also stated that she asked Lieutenant Bloemker to call Tyler Triana and gave Tyler's number to Lieutenant Bloemker.

26

¶ 46    Finally, the minor children's guardian *ad litem* questioned the respondent. The respondent denied that she was fleeing physical abuse when she left Indiana for California. She stated that she spoke with Kaylyn Nalewajka while at the hospital and that Nalewajka asked the respondent if she could give the children McDonald's. The respondent added that she informed Nalewajka of J.E.'s medical food allergies but that Nalewajka did not listen to the respondent. The respondent stated that at no point did she tell Nalewajka that the respondent was agreeable to Nalewajka temporarily taking the children.

¶ 47    Lieutenant Bloemker was called to testify in rebuttal, and stated that he was present in court and heard the respondent's testimony. He was questioned regarding the $40 and stated that he could not recall whether the respondent showed him the money or just told him that she had the money on her. Lieutenant Bloemker stated that he did not physically take the respondent into custody and, therefore, did not take an inventory of any items on her person. Lieutenant Bloemker stated that the hospital may have taken such an inventory. Lieutenant Bloemker further stated that he did not recall asking the respondent about her keys. Regarding what the respondent did at Walmart, Lieutenant Bloemker testified that, to the extent he could recall, the respondent had been dropped off at Walmart and had gotten food for the children.

¶ 48    According to Lieutenant Bloemker's rebuttal testimony, the respondent provided her correct name but an incorrect birth date that, to the best of his recollection, was off by a year. Lieutenant Bloemker noted that it appeared that the respondent accidentally gave him the wrong date of birth. Lieutenant Bloemker stated that he did not confront the respondent on the birth date discrepancy because by the time he realized what had

27

happened, he and the respondent were at the hospital where she was being evaluated by the emergency room staff. At that point, Lieutenant Bloemker was on the telephone with his dispatch who ran the respondent's vehicle's license plate number. According to Lieutenant Bloemker, the license plate number had been checked out earlier that day by another deputy and the respondent's correct date of birth was found.

¶ 49    Lieutenant Bloemker was asked whether he asked the respondent if she could provide the contact information of anyone who might assist her, to which he stated that he tried asking the respondent about her family while they were at the Pilot Truck Stop but that she could not provide him with anyone's name. Lieutenant Bloemker could not recall if the respondent mentioned C.S.'s father and she did not inform Lieutenant Bloemker when she started traveling to California. Further, Lieutenant Bloemker could not recall if he obtained the information that the respondent was travelling to California from her or from J.E. The respondent did not indicate what the problem with her vehicle was and Lieutenant Bloemker could not recall if he asked her that question or not. Lieutenant Bloemker did not recall the respondent informing him of the name of C.S.'s father but believed he obtained that information from J.E. According to Lieutenant Bloemker's knowledge, the respondent listed no one as a contact person at the hospital. In fact, Lieutenant Bloemker stated that he asked the respondent who he could reach out to and call for assistance, but he could not recall that the respondent gave him any names.

¶ 50    On cross-examination, Lieutenant Bloemker testified that he did not inventory the respondent's belongings because he had no reason to arrest her. Further, Lieutenant Bloemker reiterated that the birth date provided by the respondent was only off by one

28

number of the year and that he would typically write that information down in his field notebook. Lieutenant Bloemker acknowledged that he did not include that specific date in his report, but he stated that it was not possible that the respondent gave him her correct birth date and he wrote it down incorrectly.

¶ 51    The circuit court then heard testimony from the father of C.S., who stated that he was 29 years old, lived in Evansville, Indiana, had been together with the respondent for about five years, and had known her since 2011. According to the father, on July 27, 2021, the respondent left the home between 1 and 3 o'clock in the morning to travel to her sister's house in California. He stated that he knew that the respondent was leaving, and the reason was for her business. He continued his testimony stating that he became concerned about the respondent when he woke up around 7 o'clock in the morning and was calling the respondent to check on her and the minor children to see how they were doing. The father stated that he became worried when he called several times and did not get an answer. At that point, C.S.'s father stated that he filed a missing persons report "just in case something did happen at least they would check on them or something."

¶ 52    On cross-examination, C.S.'s father stated that he believed the respondent had a telephone when she left the home. Further, he acknowledged that he made the missing persons report only a couple of hours after the respondent had left the home, which counsel asked would have been about the same time that the respondent would have been in Effingham after her car broke down and she left her telephone in the car. The father agreed with this question, stating that he woke up at about 6 o'clock in the morning, got ready to leave for work at about 7 o'clock, and that was when he was calling to check on the

respondent. The father further testified that he did not make the missing persons report to get the respondent in trouble. Upon questioning by different counsel, the father stated that he had contacted the police, specifically 9-1-1, to file the missing persons report. He was unsure of the police officer's name who came to the home to speak with the father, but stated that the officer from the Evansville Police Department arrived between 7 and 8 o'clock in the morning.

¶ 53    At the close of all the evidence, the circuit court took a brief recess and then heard statements from counsel. The circuit court made its findings and ruling on the record in open court, stating that the burden of proof upon the State was that by a preponderance of the evidence, the minor children were in an injurious environment. The circuit court stated that it had found the testimony of Lieutenant Bloemker to be compelling and certainly credible. The circuit court noted, in ruling on the motion for directed finding, that it had stated that it had not heard any expert professional evidence regarding the respondent's condition, however, it had heard sufficient evidence to conclude, by a preponderance of the evidence, that, at the least, the respondent was suffering or laboring under an emotional trauma at the time or a disturbance that rendered her incapable of making sound decisions for the benefit of the minor children.

¶ 54    The circuit court further noted that the respondent's story "certainly, it simply has too many holes in it. Too many things that a reasonable person would not do." The circuit court listed certain evidence including the respondent leaving in the middle of the night for California without a plan; there being no plan whatsoever for the minor children; the lack of money; that the respondent did not know where she was going or going to stay; that the

30

respondent was willing to go all the way to California but did not have any plans whatsoever; and that the respondent broke down, got lost, and had no money. The circuit court found that these were not the decisions of a person who was making sound decisions. The circuit court continued stating that the respondent's actions were alleged in the juvenile petitions and that her actions when she met Lieutenant Bloemker and the caseworker, Nalewajka, were not impeached or refuted at the hearing. The circuit court found that, maybe not at the current moment, but at least at the time of the July 27, 2021, incident, its opinion was that the respondent was certainly suffering from a mental illness.

¶ 55    The circuit court again reiterated that mental illness alone does not equate to neglect, and that the mental illness was only relevant to the extent that it placed the minor children in an injurious environment. The circuit court found that, for the reasons stated, it believed that on July 27, 2021, the respondent's mental health did place the children in an injurious environment. It continued stating that it in no way believed that the respondent was a bad person or bad parent, but that, certainly, on that date, "her decisions were not those of a sound person, a sound parent." For those reasons, the circuit court found that the State met its burden by a preponderance of the evidence that the minor children were neglected as alleged in the juvenile petitions. The circuit court then admonished the respondent to cooperate with DCFS.

¶ 56    The circuit court entered its written adjudicatory order on the same date, January 12, 2022, finding the minor children to be abused or neglected as defined by section 2-3 of the Act (705 ILCS 405/2-3 (West 2020)), in that the minors were in an environment that was injurious to the welfare of the minors as defined by section 2-3(1)(b) of the Act (*id.*

31

§ 2-3(1)(b)). The written adjudicatory order does not specifically enumerate the basis for the circuit court's finding.

¶ 57    On January 24, 2022, DCFS filed its integrated assessment with the circuit court. The assessment described the circumstances on July 27, 2021, that brought the minor children into protective custody and detailed the parent/guardian interview and personal history of the respondent. The assessment indicated that on July 27, 2021, the respondent was involuntarily admitted to OSF Heart of Mary Medical Center in Urbana, Illinois, for one week due to concerns regarding her mental health after she appeared to be having a "psychotic episode." Upon her discharge, the respondent was prescribed three medications, but collateral reports indicated that she refused to take the medication. According to the assessment, the respondent's mood instability impacted her ability to effectively and safely parent the minor children and, given her untreated mental illness, she was not ensuring that the minor children's safety and well-being needs were being met. It also noted that, during the course of the investigation, the respondent exhibited signs and symptoms of psychosis which affected her problem-solving and decision-making in keeping the minor children safe. The assessment recommended that the respondent engage in individual trauma-informed therapy, psychiatric treatment and monitoring, obtain a domestic violence offender assessment, obtain her medical and mental health records for review, obtain an out-of-state child welfare background check, and participate in visitation with the minor children.

¶ 58    On February 2, 2022, DCFS filed its dispositional report with the circuit court that set forth in great detail the facts and circumstances surrounding the events of July 27, 2021.

The report noted that the services recommend in the respondent's service plan included parenting, cooperation, mental health, substance abuse, and domestic violence services. As to the respondent's mental health services, the report noted that the caseworker spoke with Southwestern Behavioral Healthcare on January 26, 2022, and it was revealed that the respondent was referred there in August 2021, but that she was discharged in December 2021, due to lack of attendance. This resulted in another assessment being completed on January 18, 2022, with an individual therapy appointment scheduled for February 7, 2022.

¶ 59 The report indicated that the respondent resided with C.S.'s father and the conditions of the home were unknown since it was out of state. The report further stated that on January 31, 2022, the respondent reported that she was working part-time at Chuck E. Cheese and at FedEx Ground, as well as focusing on her business, which was "spreading awareness for people who are experiencing some of the same things as her." As to the substance abuse services, it was reported that the caseworker spoke with the office manager at Counseling for Change, who informed the caseworker that the respondent had completed an assessment on January 25, 2022, but that she had been difficult with the staff in providing a drug screening on that date. The respondent ultimately failed to provide the screening and contacted the DCFS caseworker, stating that she had refused the drug screening due to the office manager's "wanting to inspect my vagina." The respondent informed the DCFS caseworker via text on January 30, 2022, that the respondent would obtain a drug screening from Walgreens/LabCorp and would sign a release for the information.

¶ 60 The report indicated that the respondent had reported that she had completed a domestic violence assessment, but the caseworker had not received documentation to confirm that assessment. The report further noted that the respondent traveled to West Frankfort, Illinois, for weekly, supervised visitation. The respondent appeared to be engaged with the minor children during the visits and engaged in age-appropriate activities with them such as reading, playing, bringing them food, and helping J.E. with his homework. The report listed 16 visits, either in-person or by video, that the respondent had attended. The report noted barriers to the respondent's accessing services, such as her feeling that she was not working with trustworthy people and was hesitant to sign releases, which the caseworker stressed to the respondent was important. According to the report, the respondent contacted the caseworker on January 25, 2022, and informed the caseworker that "I'm also signing releases to my lawyer so that you don't have to be burdened with making sure my kids come home." The respondent also informed the caseworker that she would be bringing her own hard copies to court.

¶ 61 The caseworker further noted in the report that the respondent appeared to have moments of insight into why DCFS was recommending services, but at other times, she denied any level of responsibility and failed to cooperate with DCFS. The report also stated that the respondent was observed after the adjudicatory hearing outside of the courthouse and was yelling and screaming at the police officer, complaining that the officer lied under oath during the hearing. The report noted that the respondent was unable to control her emotions, both at court hearings and in her interactions with DCFS. The report summarized that the respondent's progress was minimal and did not support the rating of satisfactory

34

progress for her service plan since she took little to no responsibility for her actions, which resulted in the minor children's removal. Further, it was noted that the respondent had just recently become cooperative with beginning her services. The report recommended that DCFS maintain custody and guardianship over the minor children and that the matter be set for a permanency hearing.

¶ 62 On February 9, 2022, the circuit court conducted a dispositional hearing and heard arguments from counsel regarding the petition to intervene filed by Erica Balom in the matter concerning J.E., 21-JA-29. The circuit court denied the petition to intervene and that issue is not before this court on appeal. Testimony was then presented by Elizabeth Shafer, who stated that she is a child welfare specialist for DCFS, was familiar with the minor children as their caseworker since August 2021, and that she had prepared and filed the dispositional report. Shafer identified the respondent and stated her opinion that the minor children be made wards of the court. Shafer based her opinion upon the information gathered in the integrated assessment and the adjudicatory hearing. According to Shafer's testimony, the assessment made recommendations for the respondent and the minor children that needed completion before the minor children could be returned to the respondent. As to the respondent, Shafer stated that it was recommended that she attend visitation, obtain and review medical and mental health records, attend individual therapy, and a couple more services that Shafer could not recall.

¶ 63 Shafer testified that she was able to obtain medical records from the respondent. The medical records pertained to the respondent's emergency room visit in Effingham on the day the minor children came into protective care, as well as the records for the

35

respondent's psychiatric treatment in Champaign, Illinois. As a result of those records, Shafer stated that the respondent was recommended for mental health services. Shafer acknowledged that these mental health services were the main services required for the respondent. Shafer could not recall what, exactly, the particulars were regarding the respondent's mental health services, and was allowed to refresh her memory from the dispositional report. Shafer continued stating that she had contacted Southwestern Behavioral and was informed that the facility had to reschedule the respondent's appointments due to her lack of attendance. Shafer stated that the respondent was rescheduled to begin therapy on February 7, 2022. According to Shafer's testimony, the respondent received no mental health treatment or therapy from August 2021 until February 7, 2022.

¶ 64 Shafer further testified that parenting classes were required under the respondent's service plan, but that the classes had not been completed because the respondent had not engaged in the parenting classes that she knew of. Shafer stated that she had contacted the department in Indiana where the respondent was to attend the classes and was awaiting a return call to obtain information as to whether the respondent was participating in classes. As such, Shafer was unable to verify for sure whether the respondent had completed any of the required parenting classes. Shafer stated that the respondent was also recommended to complete a substance abuse assessment and comply with any recommendations that resulted from the assessment. Shafer testified that the respondent went to an agency for the assessment, but that she did not complete the assessment in its entirety. According to Shafer's testimony, the assessment was not completed because the respondent was not

comfortable with completing a drug screening at the agency. Shafer stated that she believed that the respondent pursued another location for substance abuse services, but that no evaluation was ever completed.

¶ 65　Shafer went on to state that the respondent was recommended to complete a domestic violence assessment. Shafer testified that she had informed the respondent of an agency called ACACIA in Evansville, Indiana, but that Shafer was unsure if that was the exact name of the agency; however, she did state that she had contacted the agency, and they had no information regarding the respondent. Shafer further stated that she had observed a couple of barriers to the respondent and her services, which included the respondent's difficulty cooperating and her not signing the required releases. Shafer stated that the respondent had recently signed releases since the dispositional report was filed, but that the respondent's "cooperation has been a huge struggle." According to Shafer's testimony, the respondent's visits with the minor children were going really well and she engaged appropriately with the minor children. Shafer stated that the minor children really enjoyed seeing the respondent, and although the respondent missed a few visits, those visits had been made up. Shafer explained that there were concerns with the communication between the respondent and the foster parents and, accordingly, it was decided that DCFS or an agency that works with DCFS would supervise the visits.

¶ 66　On cross-examination, Shafer testified regarding the completion date of the integrated assessment and service plan. Shafer stated that she provided the respondent with a copy of the service plan, however, she could not recall the exact date, but that it was before a hearing at the courthouse. Shafer stated that the service plan was prepared in light

of the integrated assessment. Shafer reiterated that she had obtained the respondent's medical and mental health records. Shafer's recollection was that the investigator provided Shafer those records, but did not know how the investigator obtained the records. Shafer acknowledged that the respondent's living in Indiana posed some obstacles for reunification. Shafer further stated that she had been unable to locate parenting classes in Indiana for the respondent and that it was the respondent who located a place in Indiana to obtain domestic violence counseling.

¶ 67 Upon questioning regarding the respondent's substance abuse services, Shafer acknowledged that the respondent had undergone drug screening while at the emergency room in Effingham, and that Shafer's recollection was that there was a positive screening for THC. Upon further questioning, Shafer believed that her recollection was based on her reading of the respondent's file, which contained this information, but she could not recall if it was from the hospital records. Shafer acknowledged that this was not noted in the dispositional report and was unsure if it was noted in the integrated assessment. Shafer reiterated that the respondent lived in Evansville and that the foster parents lived in Marion, Illinois. Shafer acknowledged that Marion was several hours away by car from Evansville, that the respondent was attending her visits, and that the respondent had made extra trips to see the minor children as well. Further, Shafer stated the visits had gone quite well but that there was some friction between the respondent and the foster parents. When asked what plan DCFS had to return the minor children home, Shafer responded that it was to work with the respondent on completing her services, along with continuing and increasing visitation time as the respondent cooperates. When questioned if there was any thought of

getting the children closer to home in Evansville, Shafer stated that the respondent had not provided anyone in Indiana that the children could be placed with.

¶ 68    Counsel for the father of C.S. questioned Shafer regarding the father's services and the roadblock for placing C.S. with her father. Shafer explained that the issue was that the father and the respondent resided together, and the respondent had not cooperated or completed her services. Shafer was informed that the father and the respondent may not be residing together and was asked if this might change DCFS's position. Shafer replied that she did not have an answer for that but that she would be willing to consider placing C.S. with her father if Shafer were able to assure that the father had an appropriate home.

¶ 69    Counsel for the father of J.E. questioned Shafer regarding the respondent's "friction" with the foster parents. Shafer explained that the respondent did not like where the minor children were placed due to the foster parents' private lives and the respondent's belief that the foster parents were trying to keep the minor children. Shafer opined that there was no reason for the respondent to believe the foster parents were trying to keep the minor children. As to the respondent's positive drug screening, Shafer stated she had obtained that information while reading through DCFS's file notes and could not say exactly where it came from. Shafer then stated that she did not know what motivated or was responsible for the respondent's irrational behavior on July 27, 2021. Shafer continued stating that her lack of information was due to the respondent failing to cooperate with services to see if mental health or substance abuse services were needed. Shafer stated that she spoke with the respondent concerning a domestic violence assessment and that the respondent stated that she had signed a release, but that the facility was unable to provide

39

any information regarding the respondent upon inquiry by Shafer. Shafer further reported that she had made multiple attempts, both in-person and over the telephone, to obtain releases from the respondent. Shafer did state, however, that the respondent did provide written releases within the past month, but that this did not provide Shafer with sufficient time to obtain the information.

¶ 70 Shafer acknowledged that the respondent's overall cooperation had been a struggle, stating that she believed the respondent did not trust Shafer as a caseworker. According to Shafer, there were moments when she tried to explain things regarding "the process" to the respondent, but the respondent became frustrated and there was not a lot of cooperation. Shafer stated that the respondent did recently, within the last month, sign releases but that she had not cooperated with the facility that wanted to perform a drug screening. Counsel inquired if Shafer had an opinion regarding whether the respondent had behaved rationally in this matter with regards to her minor children and Shafer stated that her opinion was that the respondent was being irrational in her dealings with Shafer and that "it's hard to deal with somebody rationally that's being irrational." Shafer based her opinion on that fact that she recently received an email from a different place where the respondent was going to complete a drug screening and that facility informed Shafer that "they could not work with [the respondent] because of her behaviors." Shafer further based her opinion on her overall conversations with the respondent through text messages and telephone calls.

¶ 71 At the close of the evidence and after arguments from counsel, the circuit court took judicial notice of the dispositional report and the integrated assessment and took the matter under advisement. The circuit court granted the parties the opportunity to supplement the

record regarding any documentation concerning progress on the service plan that they may not have had access to at the time of the hearing. The matter was set for a status hearing on March 23, 2022. On March 11, 2022, the respondent's counsel filed a motion to withdraw at the respondent's request, which was also set for a hearing on March 23, 2022.

¶ 72    At the March 23, 2022, status hearing, the circuit court stated that the parties had not supplemented the record with any documents and that, through no fault of the attorneys or parties, it had not entered its ruling regarding the dispositional hearing. The circuit court noted that the respondent was not present in court and asked if the respondent's counsel wished to proceed on the motion to withdraw. Based upon the respondent not being present, counsel requested to continue the motion to withdraw until the next court date, which the circuit court set for April 6, 2022.

¶ 73    At the April 6, 2022, hearing, the respondent informed the circuit court that she changed her mind regarding the withdrawal of her counsel, and the circuit court took no action on the motion to withdraw. The circuit court stated that in anticipation of the hearing, it had fully considered the record before it, the testimony presented at the adjudicatory and dispositional hearings, the reports prepared and submitted by DCFS, and the arguments of counsel. The circuit court then issued its findings and ruling on the record. The circuit court found that, based upon everything before it at that juncture, it was in the best interests of the minor children to be made wards of the court and granted guardianship to DCFS with the power to place the minor children. The circuit court noted that the minor children were currently placed together in a traditional foster placement and doing quite well. The circuit court stated that it had reviewed the issue of progress up to that point and believed it was

in the best interest to continue the status quo. The circuit court set the matter for a permanency hearing on July 13, 2022, and stated that it was inclined to establish an initial permanency goal of return home within 12 months. It then explained to the respondent what permanency meant and the process that the circuit court would follow.

¶ 74 The circuit court entered the dispositional order on April 6, 2022, finding the respondent unfit and unable, for reasons other than financial circumstances alone, to care for, protect, train, educate, supervise, or discipline the minor children. The circuit court further found that reasonable efforts and appropriate services aimed at family reunification could not prevent or eliminate the necessity for the removal of the minor children from the home at that time and that leaving the minor children in the home was contrary to the health, welfare, and safety of the minor children. Based upon those findings, the circuit court found it to be in the best interest of the minor children to grant custody and guardianship to DCFS. The circuit court's dispositional order also directed that the nature and length of visitation was at the discretion of DCFS.

¶ 75 The respondent now appeals, arguing that the circuit court's ruling that the minor children were neglected due to being in an injurious environment was against the manifest weight of the evidence.

¶ 76 II. ANALYSIS

¶ 77 The Act (705 ILCS 405/1-1 *et seq.* (West 2020)) provides a step-by-step process to be used in determining whether a child should be removed from his or her parents and made a ward of the court. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). The first step of the

process begins with the State filing a petition for wardship. *Id*. Then, a temporary custody hearing is conducted at which the court must

> "determine whether there is probable cause to believe that the child is neglected, whether there is an immediate and urgent necessity to remove the child from the home and whether reasonable efforts have been made to prevent the removal of the child or that no efforts reasonably can be made to prevent or eliminate the necessity of removal." *Id*.

If probable cause is found, the child is placed in temporary custody and the process continues. *Id*.

¶ 78　The second step of the process, the adjudicatory hearing, requires the court to determine whether the child was the subject of abuse, neglect, or dependence. *Id*. Section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2020)) defines a "neglected minor" to include "any minor under 18 years of age *** whose environment is injurious to his or her welfare." The general definition of "neglect" is the " ' "failure to exercise the care that circumstances justly demand." ' " *In re Arthur H.*, 212 Ill. 2d at 463 (quoting *In re N.B.*, 191 Ill. 2d 338, 346 (2000), quoting *People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 624 (1952)). "Neglect" is not limited or fixed to this definition. *Id*. By necessity, "neglect" is fluid and includes both willful and unintentional disregard of duty. *Id*. Similarly, "injurious environment" does not have a fixed definition, but has been interpreted to include " 'the breach of a parent's duty to ensure a "safe and nurturing shelter" for his or her children.' " *Id*. (quoting *In re N.B.*, 191 Ill. 2d at 346, quoting *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995)).

43

¶ 79 "At the adjudicatory hearing, 'the court shall first consider only the question whether the minor is abused, neglected or dependent.' " *In re A.P.*, 2012 IL 113875, ¶ 19 (quoting 705 ILCS 405/2-18(1) (West 2010)). "The legislature has stated that the purpose of an adjudicatory hearing is 'to determine whether the allegations of a petition *** that a minor under 18 years of age is *** neglected *** are supported by a preponderance of the evidence.' " *In re Arthur H.*, 212 Ill. 2d at 465 (quoting 705 ILCS 405/1-3(1) (West 2000)). "The plain language of this provision instructs the circuit court to focus solely upon whether the child has been neglected." *Id.*

¶ 80 "[C]ases involving allegations of neglect and adjudication of wardship are *sui generis* and must be decided on the basis of their unique circumstances." *Id.* at 463. It is the State's burden to prove allegations of neglect by a preponderance of the evidence; meaning, the State must prove the allegations are more probably true than not. *Id.* at 463-64. Neglect and injurious environment findings are fact driven, and on review, a finding of neglect will not be reversed unless it is against the manifest weight of the evidence. *Id.* at 464. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id.* This court will not disturb the circuit court's findings unless the record clearly demonstrates that the court should have reached the opposite result or that the court's determination is unreasonable, arbitrary, and not based on evidence. *In re D.W.*, 386 Ill. App. 3d 124, 134-35 (2008). If the State fails to prove the allegations of abuse, neglect, or dependence by a preponderance of the evidence, the petition must be dismissed. *In re Arthur H.*, 212 Ill. 2d at 464. If a finding of abuse, neglect, or dependence is made, the third step is reached, at which point the circuit court must then determine

44

whether "it is consistent with the health, safety and best interests of the minor and the public that he be made a ward of the court." 705 ILCS 405/2-21(2) (West 2020).

¶ 81   In this appeal, the respondent argues that the circuit court's finding of neglect was against the manifest weight of the evidence. The respondent directs this court to consider the five allegations contained in the petitions for adjudication of wardship. The respondent notes that the first allegation alleges that, as a result of a mental episode, the respondent left her vehicle on the side of the road and the children running on the side of the road. The fourth allegation generally alleges that the respondent was incoherent and unable to take care of the children due to her mental state.

¶ 82   With respect to the first and fourth allegations, the respondent argues that the evidence presented at the adjudicatory hearing failed to support the factual allegations. The respondent directs this court to consider certain portions of the testimony presented during the hearing, arguing that mental illness alone is not sufficient to prove an injurious environment, and that the State almost entirely focused on the respondent's mental health. According to the respondent, very little evidence was presented regarding the minor children's well-being. The respondent argues that no evidence was presented that the respondent's mental state prevented her from adequately caring for the children given the circumstances. She argues that the evidence presented may have proven possible concerns regarding the situation, however, there was no evidence presented that the minor children were ever in any danger, nor that the respondent was not taking care of them given the situation. Lastly, the respondent argues that the remaining three allegations only relate to

45

the respondent's alleged mental health breakdown and these, standing alone, are not sufficient to meet the State's burden.

¶ 83    The State argues that the circuit court's finding that the evidence presented at the adjudicatory hearing was sufficient to prove that the minor children were exposed to an injurious environment where they were in the sole care of the respondent who was experiencing a mental health crisis due to the specific circumstances that day was not against the manifest weight of the evidence. The State further argues that, on appeal, the respondent emphasizes the version of the events that she testified to at the adjudicatory hearing contending that her self-reported actions and decisions were reasonable and contending that some of Lieutenant Bloemker's testimony was not credible. The State points out that the circuit court made explicit findings of fact and credibility determinations about the conflicting testimony of the respondent and Lieutenant Bloemker, with the circuit court noting that Lieutenant Bloemker's testimony was "compelling and certainly credible" while the respondent's "story certainly, it simply has too many holes in it. Too many things that a reasonable person would not do."

¶ 84    The circuit court has the best opportunity to observe the demeanor and conduct of the parties and witnesses, so it is in the best position to determine the credibility and weight to be given to the witnesses' testimony. *In re K.S.*, 365 Ill. App. 3d 566, 570 (2006); *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001). This court will not substitute its judgment for that of the circuit court on credibility determinations. *In re E.L.*, 353 Ill. App. 3d 894, 897 (2004). Given the delicacy and difficulty of child custody determinations, the circuit court

has even greater discretion than in an ordinary appeal applying the manifest weight of the evidence standard. *In re A.L.*, 2012 IL App (2d) 110992, ¶ 13.

¶ 85    Here, we find that the circuit court's finding that the minor children were neglected because their environment was injurious to their welfare was not against the manifest weight of the evidence. Contrary to the respondent's assertions, the testimony of Lieutenant Bloemker and Kaylyn Nalewajka, at the adjudicatory hearing conducted on January 12, 2022, supports a finding that on July 27, 2021, the respondent was suffering from an acute mental health crisis that created an injurious environment for the minor children. The record in this matter does not demonstrate that the circuit court should have reached the opposite result, nor does the record indicate that the circuit court's determination was unreasonable, arbitrary, or not based on evidence. Based on the evidence presented and considering the deference given to the circuit court in these matters, we find the circuit court's determination that the minor children were neglected was not contrary to the manifest weight of the evidence, and therefore, we affirm the circuit court's determination of neglect and its finding that it was in the children's best interests to be adjudicated wards of the court.

¶ 86    We note that the respondent briefly alludes that the written adjudicatory orders were deficient because they did not state a specific factual basis, but she does not raise an argument based on this assertion, and points not argued are forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Forfeiture aside, the circuit court did make explicit findings of fact and determinations of credibility at the close of the adjudicatory hearing on the record supporting its finding that the minor children were neglected due to an injurious

47

environment. In such cases, the statutory requirement of a written explanation is satisfied. See *In re Leona W.*, 228 Ill. 2d 439, 458-59 (2008) (deficiency in written adjudicatory order was cured by circuit court's oral pronouncements, which clearly spelled out its reasoning).

¶ 87                                    III. CONCLUSION

¶ 88     Based on the above, we find that the circuit court's finding that the minor children were neglected because their environment was injurious to their welfare was not contrary to the manifest weight of the evidence, and therefore, we affirm the judgment of the circuit court of Effingham County.

¶ 89     Affirmed.